**In the Matter of INVESTORS FUNDING CORPORATION OF NEW YORK et al., Debtors.**

**Bankruptcy Nos. 74 B 1454, 1455, 74 B 1511–42 DBB.**

United States District Court, S. D. New York.

Dec. 23, 1980.

Weil, Gotshal & Manges, New York City by Alan B. Miller, Thomas Weber, David J. Ciminesi, New York City, for Trustee.

Stillman, Friedman & Shaw, P. C., New York City by Charles A. Stillman, New York City, for IFC Collateral Debentureholders' Committee.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City by Richard Lieb, New York City, for IFC Debentureholders' Protective Committee.

Milbank, Tweed, Hadley & McCloy, New York City by John J. Jerome and Michael J. Levin, New York City, for Chase Manhattan Bank.

James Rayhill, New York City, for U. S. Trust Co.

Alexander & Green, New York City by David S. Pennock and John Macuga, Jr., New York City, for Helmsley Enterprises.

Winer, Neuberger & Sive, New York City by David Paget, New York City, for Republic Life Ins. Co.

Zalkin, Rodin & Goodman, New York City by Richard Toder, New York City, for The First Nat. Bank of Chicago, Citibank, N. A., and Chemical Bank.

Proskauer, Rose, Goetz & Mendelsohn, New York City by David Goldblatt, and David Aronson, New York City, for Ernst & Whinney.

Cahill, Gordon & Reindel, New York City by R. Anthony Zeiger, New York City, for Peat, Marwick, Mitchell & Co.

Samuel M. Krieger, John F. Murray, New York City, for Securities and Exchange Commission.

## OPINION

BONSAL, District Judge.

Investors Funding Corporation of New York ("IFC") is a publicly-held company. Its stock was listed on the American Stock Exchange on December 16, 1961. The subordinated debentures of IFC and its wholly-owned subsidiary, IFC Collateral Corporation ("IFC Collateral") are publicly-held. On December 31, 1974, IFC had approximately 8,000 stockholders and 26,000 debentureholders.

On October 21, 1974, IFC and IFC Collateral filed petitions for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501, et seq. Thereafter, a joint petition was filed on behalf of its wholly-owned subsidiaries. On November 1, 1974, James Bloor was appointed Trustee.

The Chapter X proceedings were precipitated by the inadequacy of the cash flow of IFC and its inability to pay its debts as they matured. IFC was unable to pay the interest on its debentures and those of IFC Collateral which became due on October 1, 1974.

IFC was organized as Dansker Realty and Securities Corporation in 1946, its name being changed to IFC in 1952. It developed a substantial business in the real estate field. In the 1960s, through its newly-created, wholly-owned subsidiary IFC Collateral, IFC began to lend money secured by junior mortgages. IFC financed its business by the public sale of common stock and debentures, and debentures of IFC Collateral. IFC began selling debentures in 1959 and IFC Collateral began two years later, in 1961. By the end of 1973, there were approximately $140,000,000 principal amount of debentures of IFC and IFC Collateral in the hands of the public.

In the years preceding the Chapter X petition, IFC sustained severe financial losses. According to the Trustee's Section 167(3) report, at the beginning of 1968 IFC reported a consolidated financial position showing:

| Total Assets | Total Liabilities | Shareholders' Equity |
|---|---|---|
| $76,073,000 | $70,845,000 | $5,228,000 |

As of December 31, 1974, the Trustee reported IFC's consolidated financial position as follows:

| Total Assets | Total Liabilities | Shareholders' Equity |
|---|---|---|
| $193,115,000 | $346,399,000 | ($153,284,000) |

Prior to the Chapter X proceedings, the management of IFC was in the hands of three Dansker brothers, who owned more than 90% of the Class B common stock of IFC, which elected two-thirds of its Board of Directors, and more than 10% of the Class A common stock. Investigation made by the Trustee pursuant to Section 167(2) of the Bankruptcy Act brought out that the Dansker management, with the participation of others, had perpetrated a massive fraud upon IFC and its security holders.

## LITIGATION

Following his investigation, on October 21, 1976 the Trustee instituted a plenary action in this Court, *Bloor v. Dansker*, 76 Civ. 4679 (WCC) naming the Danskers among some 188 defendants. Included among the defendants were the banks who had made loans to IFC (a consortium under the leadership of The Chase Manhattan Bank, N.A.) which, it is charged, aided in the concealment of IFC's deteriorating financial condition by extending additional credit in return for a secured position which is stated in the 1973 and 1974 credit agreements entered into between the banks and IFC. The banks, denying the Trustee's charge, instituted an action in the Bankruptcy Court against the Trustee (*Chase v. Bloor*, 74 B. 1454, 1455 and 74 B. 1511–1542 inclusive) for the purpose of enforcing their security.

Five class actions are pending in this District which were brought by debentureholders and shareholders of IFC, naming as defendants the banks and the Danskers, among others, which actions have been consolidated for trial before Judge Conner.

## REORGANIZATION

In late 1976, the Trustee issued his reports pursuant to Sections 167(1), (3) and (5) of the Bankruptcy Act. The Trustee found the estate insolvent and concluded that a conventional reorganization was not possible, the only practical solution being liquidation.

To obtain a second opinion, the court appointed Mr. Herbert Silverman, a business consultant, in the spring of 1977 to review the financial condition of IFC. In June, Mr. Silverman filed his report concurring in large measure with the conclusions of the Trustee. However, while the Trustee felt that liquidation was the only possible solution in the absence of a substantial infusion of new capital, Mr. Silverman thought that there might be a possibility of reorganization.

In early 1978, thanks to the cooperation of the Trustee, the banks and the IFC Debentureholders Protective Committee, an Internal Plan of reorganization was formulated which, on April 12, 1978, was the subject of a press release which was mailed to all creditors, debentureholders and stockholders. Under this Plan, it was possible that the debentureholders might, over a period of years (at least five), realize somewhere between 13.5% and 20% on their investment. Negotiations continued with respect to the Internal Plan, but it was not perfected because of the pendency of the above-mentioned lawsuits and, in particular, the issues raised in *Chase v. Bloor* and *Bloor v. Dansker* between the Trustee and the banks.

In the summer of 1979, while these negotiations were still under way, Mr. Harry B. Helmsley, a prominent real estate owner and operator in New York, took an interest in IFC. Mr. Helmsley commenced negotiations with the banks, which led to further negotiations between the banks, the debentureholders committees and the Trustee. These negotiations led to the Helmsley Plan of Reorganization which was filed by the Trustee on August 13, 1980 and a copy of which is attached hereto. At the time of filing of the Helmsley Plan, the assets of IFC consisted of approximately $60,000,000 of cash invested in short term securities (a substantial portion of which resulted from

the sale of properties by the Trustee), a mortgage portfolio, two operating properties (apartment houses), parcels of vacant land, most of which are located in New York and New Jersey, and the capital stock of Security Title & Guaranty Co. The Trustee valued these assets of $92,000,000.

On the liability side, at the time of the filing of the Helmsley Plan, the claims of the banks exceeded $100,000,000 and the principal amount of the outstanding debentures of IFC and IFC Collateral was approximately $140,000,000. In addition, IFC owed unsecured debts of between $12,000,-000 and $15,000,000.

Under the Helmsley Plan, IFC's present assets (other than cash) would vest in the reorganized company, and Helmsley Enterprises would contribute assets having a value of at least $70,000,000. Some of the cash would be paid to the reorganized company by the Trustee for the purposes set forth in the Helmsley Plan (Article I, "designated Cash Funds", p. 5). The balance of the cash would be used by the Trustee to cover the expenses of carrying out the Plan and to make payments to the banks, debentureholders and general creditors hereinafter described.

The Helmsley Plan provides that five of the banks (participating banks) would receive preferred and common stock of the reorganized company while the remaining nine (non-participating banks) would accept 65% of the principal amount of their claims, estimated at $14,300,000, in full settlement of their claims. All claims between the Trustee and the banks would be settled by the Plan, and the lawsuits, insofar as they involve the Trustee, the banks, and Republic, would be dismissed with prejudice. The result is that the banks' claim of $100,000,-000 would be eliminated through the issuance of the preferred and common stock and the payment of approximately $14,300,-000. Republic National Life Insurance Co., holder of senior convertible debentures in the principal amount of $3,000,000, would compromise its claim for $805,000.

Having provided for the priority claims, the Helmsley Plan provides that the debentureholders will receive 20¢ on the dollar if they purchased their debentures prior to the Chapter X petition, and 16¢ on the dollar if they purchased afterwards, provided they purchased before August 13, 1980. In addition, the debentureholders will share with the banks in any further recoveries by the Trustee in *Bloor v. Dansker* and by the plaintiffs in the class actions with respect to remaining defendants.

Other provisions of the Plan require (1) that the five class actions shall have been partially settled with the approval of the court in which they are pending, and that not more than ten percent of the class involved shall have opted out, and (2) that the order of confirmation of the Plan shall have become final on or before April 9, 1981.

The foregoing is a very brief synopsis of some of the features of the Plan of Reorganization which has been filed in this proceeding and to which reference must be made for a full understanding of the Plan.

## FAIRNESS AND EQUITY

As previously noted, under the Helmsley Plan the debentureholders who acquired their debentures prior to the filing of the Chapter X petition, as well as general creditors, will recover 16 percent of the principal amount of debentures held by them. The debentureholders who acquired their debentures prior to the filing of the Chapter X petition will receive an additional 4 percent of that amount in settlement of their class action claims.

Section 174 of the Bankruptcy Act requires that the court determine that this distribution is "fair and equitable" to the debentureholders and general creditors.*

In considering whether the recovery by the debentureholders is fair and equitable, reference is made to Table VIII of the SEC Report, which sets forth amounts the debentureholders would receive on certain as-

* The banks and Republic have agreed to the settlements provided in the Helmsley Plan.

sumptions therein made.** This table indicates that if the banks are given senior and secured status, the debentureholders would recover nothing on their claims. If the banks were to be treated as senior and unsecured lenders, they would still receive the larger part of the distributed assets, while the debentureholders would receive approximately 14 million dollars. Of course, if the Trustee were successful in contesting the allegedly senior position which the banks claim they occupy by virtue of the 1973 and 1974 Credit Agreements, the debentureholders would receive over 54 million dollars. As previously indicated, this result is unlikely and could not be achieved for a number of years.

Should the Helmsley Plan be confirmed, the debentureholders will receive almost twice as much as would be distributed to them if the banks retained their claimed seniority.

■ Having considered the alternatives, for the reasons above stated the Court concludes that the distributions to the debentureholders and general creditors under the Helmsley Plan are fair and equitable.

■ In addition, before this Court can approve the Helmsley Plan, it must find that the proposed settlement of *Chase v. Bloor* and proposed partial settlements of *Bloor v. Dansker* and the five class actions are fair and equitable under Section 174 of the Bankruptcy Act. *See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

In his testimony during the hearings on the Helmsley Plan, Mr. Anderson, counsel for the Trustee in *Chase v. Bloor* and *Bloor v. Dansker*, in which the banks are included with others as defendants, testified that the suits involved issues of considerable complexity and magnitude, that their outcome was uncertain, and that the likelihood of recovery was unclear in light of recent interpretations of the securities laws in the Supreme Court and in the Courts of Appeals. In Mr. Anderson's opinion, the pro-

posed resolution of the litigation between the Trustee, the banks, and Republic represents a fair and reasonable compromise of the litigation.

The considerations mentioned by Mr. Anderson apply with the same force to the five class actions.

■ As the Court of Appeals for this circuit has said:

"[t]he test to be applied where there is a judicial review of a consensual plan of reorganization is whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities [citations omitted]. The reviewing court must determine that the value of the proposed compromise distribution is reasonably equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved." *In re New York, New Haven and Hartford Railroad Co.*, 632 F.2d 955, 960 (2d Cir. 1980).

■ Under the terms of the Helmsley Plan, the banks are surrendering their claims to security under the 1973 and 1974 Credit Agreements; Republic is accepting a reduced amount of cash in return for the extinguishment of its debentures; and the Trustee and the plaintiffs in the class actions are, in turn, giving up their claims against the banks and Republic.

As previously noted, in the event of a liquidation, or under the Internal Plan of 1978, the debentureholders would not do nearly as well as they will under the Helmsley Plan. Under the proposed settlement, in addition to the 16 percent recovery, each participating debentureholder who made his purchase before the filing of the Chapter X petition will receive an additional 4 percent of the principal amount of the debentures held by him.

If the lawsuits are not settled to the extent indicated, they may not be finally adjudicated for several years. Accordingly, in view of the difficult issues raised, the

** Copy attached to this Opinion.

complexity of the litigation, and the length of time before any resolution of the litigation could be expected, this Court finds that the provisions in the Plan with respect to the settlement of *Chase v. Bloor* and the partial settlement of *Bloor v. Dansker* and the five class actions as to certain defendants are fair and reasonable.

## VALUATION

At the hearings, the Trustee testified at length on the value of the IFC assets which would be available to the reorganized company. He valued these assets, as of Dec. 31, 1980, as follows:

| | |
|---|---|
| Mortgages Receivable | $11,055,000 * |
| Real Estate | 15,670,120 |
| Common Stock of Security Title and Guaranty Company | 6,168,000 |

* During the September hearings, the Trustee increased this value to $11,877,000.

The available cash, as of December 31, 1980, is estimated at $65,575,000, of which it is contemplated that more than 50 million will remain after satisfaction of mortgage arrears, administrative and priority claims, and other expenses.

There was evidence at the hearings that the Trustee's valuations of the designated properties were too conservative. The appraisal of Jerome Haims Realty, Inc., which was retained by Helmsley valued the property at a value which would have increased the value of these assets by approximately 24 million dollars. However, during the hearings, Mr. Scanlan, vice-president of Helmsley Enterprises, testified that he had orally instructed Mr. Haims to value the IFC assets to be revested in the reorganized company on the basis of their value to a developer such as Helmsley with both the financial resources to hold the assets and the skill to develop them so as to realize their maximum value. Mr. Scanlan stated that Mr. Haims carried out those instructions in appraising the assets.

Since the Plan is predicated on a finding of insolvency, the Court must consider the value of the assets to be transferred to the reorganized company. The SEC notes in its report that since the undeveloped real estate holdings of IFC are producing no income, the separate valuation of each significant asset is the most accurate method of valuation.

The valuation of the assets being contributed to the reorganized company is discussed at length in the SEC's report beginning at page 21. The SEC points out that Helmsley retained an appraiser to value the various parcels of real estate on the basis of their value to Helmsley and that these valuations are substantially higher than those of the Trustee. However, it is clear that whichever valuation is used on a liquidation, there would be nothing left for the stockholders, so that the only issue is whether the Class No. 6, debentureholders and general creditors, are being fairly treated (all of the prior classes having consented to the Plan). The SEC suggests that to compensate for the difference in valuations the debentureholders be given some kind of a continuing interest in the reorganized company, perhaps during the period in which it will enjoy the carry-forward losses referred to in the report. However, such a proposal has been found impossible to implement.

## FEASIBILITY

Section 174 of the Bankruptcy Act requires that a plan of reorganization be feasible. Therefore, the reorganized company must have assets which will generate sufficient income to assure its long-term viability. The SEC report at page 37 states:

"It is clear that the reorganized company, not unlike other real estate companies, will be highly leveraged. The Enterprises subsidiaries' pro forma consolidated balance sheet reflects an equity of only $5.1 million and $78.6 million of mortgages and loans payable. It appears, however, that the cash flow from these companies will be ample to provide for the debt service on those loans. For the year ended June 30, 1979, the combined cash flow, before interest, amortization of loans and depreciation, was approximate-

ly $16.2 million. The debt service, principal and interest, is estimated at $10.9 million.

"It appears that the Debtors' assets will generate a significant positive cash flow. During 1981, the mortgages will generate about $1.3 million cash from monthly interest and amortization payments * and the cash disbursements for taxes and mortgages payable on the undeveloped land will total approximately $550,000. Although the two operating properties and Security Title have a history of a combined cash flow from operations of several hundred thousand dollars, we do not include them in our cash flow equation because that cash flow may be needed for capital improvements on the properties, or, in the case of the title company, to maintain and increase its ability to write large title policies.

* For this purpose, about $3.1 million of maturing mortgages receivable are excluded.

"Considering the foregoing, it appears that the reorganized company will have sufficient cash flow to provide for the payment of $3,967,524 in dividends on the new preferred stock."

The Court agrees that the assets of the reorganized company will generate sufficient income to meet its liabilities so that the Plan is feasible.

On September 19, 1980, following seven days of hearings, the Helmsley Plan was submitted to the Securities and Exchange Commission for an advisory report pursuant to Rule 10–303(b). The Commission filed its report with the Court on November 26, 1980. Further hearings were held on December 15, 16 and 17, 1980. Considering the history of IFC and the condition in which it was at the time of the filing of the petition under Chapter X, the classification of the creditors into six classes as provided in Article II of the Plan and the participations of each class appear to be fair and equitable and feasible. After careful consideration, the Court approves the Helmsley Plan.[1] In view of the provision that it must be consummated by April 9, 1981, February 23, 1981 is fixed as the date within which creditors and stockholders may accept or reject the Plan, and the Court determines that March 2, 1981 is fixed as the date of the hearing on confirmation pursuant to Rule 10–303(d).

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

TABLE VIII

INVESTORS FUNDING CORPORATION OF NEW YORK
TRUSTEE'S ANALYSIS OF VARIOUS CREDITOR SETTLEMENTS
AS OF DECEMBER 31, 1980
(000's omitted)

| | Claims | Case 1 | Case 2 | | | | Case 3 | | Case 4 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Banks Senior and Unsecured | | | | | | | |
| | | Banks Secured & Senior Status | Initial Calculation | Adjustment for Senior Position | Distribution | Percent | Banks On Parity w/General Creditors | Percent | Equitable Subordination | Percent |
| Available estate: | | | | | | | | | | |
| Cash | $54,164 | – | – | – | – | – | – | – | – | |
| Other assets | 32,900 | | – | – | – | – | | – | | |
| | $87,064 | $87,064 | – | – | | | $87,064 | – | $87,064 | – |

1. The only opposition to the Plan has come from Ernst & Whinney, successors to S. D. Leidesdorf & Co., and Peat, Marwick, Mitchell & Co. Leidesdorf and Peat, Marwick were former accountants for IFC and are named as defendants in the litigation referred to. They have filed claims in this proceeding for any damages they may suffer as a result of the litigation, which claims were disallowed by the Court. (Memorandum filed October 22, 1980.) The accountants have appealed.

746

| | Claims | Case 1<br>Banks Secured & Senior Status | Case 2<br>Banks Senior and Unsecured<br>Initial Calculation | Adjustment for Senior Position | Distribution | Percent | Case 3<br>Banks On Parity w/General Creditors | Percent | Case 4<br>Equitable Subordination | Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| Allowed claims: | | | | | | | | | | |
| Principal | | | | | | | | | | |
| Bank | $ 63,847 | | | | | | | | | |
| Prepetition int. | 2,153 | | | | | | | | | |
| | 66,000 | 87,064 * | $26,359 | $39,641 | $66,000 | 100.0 | 26,359 | 40.0 | $ — | — |
| Republic | 3,000 | — | 1,198 | 1,802 | 3,000 | 100.0 | 3,000 | 100.0 | 3,000 | 100.0 |
| General Creditors | 9,000 | — | 3,594 | — | 3,594 | 40.0 | 3,594 | 40.0 | 5,155 | 57.0 |
| Debenture-holders | 140,000 | — | 55,913 | (41,443) | 14,470 | 10.0 | 54,111 | 39.0 | 78,909 | 56.0 |
| | $218,000 | — | $87,064 | | $87,064 | | $87,064 | | $87,064 | |

* 82 percent of $105.9 million which includes post-petition interest as estimated by the Trustee.