**In re TOY & SPORTS WAREHOUSE, INC., et al., Debtors.**

**Bankruptcy Nos. 83 B 20162 and 83 B 20215 through 83 B 20224.**

United States Bankruptcy Court, S.D. New York.

Feb. 7, 1984.

Levin & Weintraub & Crames, New York City, for debtors in possession; Marilyn Simon, New York City, of counsel.

Stanley Hochroth, New York City, for Ira Hochroth and Corey Langus.

William I. Popper, Popper & Popper, New York City, for Unsecured Creditors' Committee.

## DECISION ON OBJECTIONS TO CONFIRMATION

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The holders of 44% of the common stock of Toy & Sports Warehouse, Inc. ("TSW"), one of the debtors in possession in this consolidated reorganization case under Chapter 11 of the Bankruptcy Code, have objected to the confirmation of the debtors' second amended consolidated plan of reorganization. Under this plan of reorganization, all of the common shareholders of TSW are wiped out. An outside funder, who is putting up $300,000, will receive 100 percent of the common stock of TSW and the unsecured creditors will receive 35 percent of their allowed claims. Apart from losing their equity interest in TSW, the objecting shareholders, whose personal liability for unpaid sales taxes will continue after confirmation, contend that confirmation of the plan should not occur because there is no assurance that the sales taxes will be paid as provided under the plan. They further assert that the proceeds from the debtors' sale of five leaseholds should have been applied towards the payment of the sales tax debt, thereby reducing or eliminating the objecting shareholders' personal liability for such taxes. An evidentiary hearing with respect to the objections, and to the proposed confirmation, results in the following:

## FINDINGS OF FACT

1. The above captioned debtors filed with this court petitions for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174. The debtor, Toy & Sports Warehouse, Inc. ("TSW"), was the parent operating company of ten other debtor companies, each being a retail store in the business of selling toys, sporting goods and related merchandise. The debtors terminated operations of five stores and sold their leasehold interests for store premises located in Riverdale, White Plains and Yonkers, New York. TSW Stores of Nanuet, Inc. negotiated a termination of its leasehold interest at the Nanuet premises with the landlord, which settled various adversary proceedings and motions pending in the Bankruptcy Court. The debtors have negotiated a contract with court approval for the sale of the warehouse premises in White Plains, New York. Litigation with the landlord of the debtors' Hartsdale, New York store concerning the landlord's application to terminate the Hartsdale lease is pending in the state court.

2. Upon application of the debtors, the date of January 6, 1984 was fixed as the adjourned date for the hearing on substantive consolidation. After taking evidence, and there being no objections, the court made findings that substantive consolidation of the various cases should be ordered for purposes of achieving a reorganization. An order to this effect was entered on January 9, 1984.

3. Thereafter, the objecting shareholders timely filed their objections to the amended consolidated plan of reorganization. The objectants are Corey Langus and his brother-in-law, Ira Hochroth, who each own 660,000 shares of TSW. The proponents of the plan, who own the majority of the common shares of TSW are William Langus, who owns 1,020,000 shares, and his son, Marc Langus, who owns 660,000 shares. The objectant, Corey Langus, is the son of William Langus and the brother of Marc Langus. The objectant, Ira Hochroth, is the son-in-law of William Langus and also the brother-in-law of Marc Langus.

4. The amended consolidated plan provides for the division of claims and interests into five classes.

Class I is comprised of the claims of creditors who are entitled to priority in accordance with §§ 503(b) and 507 of the Code, such as legal and accounting fees, other claims of the chapter 11 administration, wage claims and tax claims, except for the claims of the State of New York (the "Sales Tax Claims") for sales tax obligations of

the debtors which accrued prior to the commencement of the chapter 11 cases, including interest and penalties thereon.

Class II is comprised of claims of creditors which are secured pursuant to pre-petition security agreements by security interests in, and liens upon, property of the estate.

Class III is comprised of the Sales Tax Claims, which are entitled to priority under § 507 of the Code.

Class IV is comprised of all general unsecured claims as finally allowed by the Bankruptcy Court. Such claims are those which arose prior to the filing date, are not secured by liens on the assets of the debtors and are not entitled to priority under §§ 503(b) and 507 of the Code. An analysis of the debtors' books and records indicates that Class IV claims will aggregate approximately $4.2 million.

Class V is comprised of the claims and interests held by shareholders of all classes of stock of TSW, the parent company, which are issued and outstanding immediately prior to the confirmation date.

5. The plan provides that upon confirmation, Class I claims will receive on account of such claims cash equal to the allowed amount of the claims, or upon such other terms as may be agreed upon between the Class I claimants and the debtors. This provision satisfies the treatment required under Code § 1129(a)(9)(A) and (B).

On confirmation, Class II claims shall continue to be secured by the assets of the debtors as set forth in the claimants' pre-petition security agreements and mortgages, and shall be paid in accordance with the terms of such agreements, pursuant to a final order of the court affecting such pre-petition security agreements, mortgages and/or the assets by which they are secured, or upon such other terms as may be agreed upon between such Class II claimants and the debtors. Certain Class II claims, filed by Perma Steel, Inc. and Kruger's Toy Co., Inc., have been paid and settled in full in accordance with orders of this court. The amount paid to Perma Steel,

Inc. aggregated $6,316.28 and to Kruger's Toy Co., Inc. aggregated $8,999.07. The remaining Class II claims aggregate $695,-000 as of the date of the Disclosure Statement and consist primarily of mortgages on the debtors' warehouse in White Plains, New York approximating $680,000. This class is unimpaired by the plan within the meaning of Code § 1124(1) and satisfies the requirements of Code § 1129(a)(7)(A)(ii).

The plan provides that Class III claims shall be paid deferred cash payments on a quarterly basis over a period of six (6) years from the date of the assessment of the Sales Tax Claims, of a value, as of the effective date of the plan, equal to the allowed amount of such claims pursuant to § 1129(a)(9)(C) of the Code. This class aggregates approximately $294,000 and is unimpaired by the plan.

The plan provides that Class IV claims shall receive 35% of their allowed claims as follows:

(i) Ten (10%) percent in cash upon confirmation;

(ii) Three (3%) percent in cash on January 10, 1984;

(iii) One (1%) percent in cash on July 1, 1984;

(iv) Two (2%) percent in cash on November 1, 1984;

(v) Four (4%) percent in cash on January 10, 1985;

(vi) One (1%) percent in cash on July 1, 1985;

(vii) One (1%) percent in cash on November 1, 1985;

(viii) Three (3%) percent in cash on January 10, 1986;

(ix) One (1%) percent in cash on July 1, 1986;

(x) One (1%) percent in cash on November 1, 1986;

(xi) Three (3%) percent in cash on January 10, 1987;

(xii) One (1%) percent in cash on July 1, 1987;

(xiii) One (1%) percent in cash on November 1, 1987;

(xiv) Three (3%) percent in cash on January 10, 1988.

Furthermore, the debtors shall pay Class IV claims 50% of the debtors' net profits, if any, on a pro rata basis, with the payments to be credited against the debtors' obligations under the plan in inverse order of the date of payment. This class *is* impaired under the plan within the meaning of Code § 1124.

6. At the hearing, counsel to the creditors' committee filed a certification of acceptances and rejections of the plan which indicated that of the two impaired classes of creditors (Class IV and Class V), Class IV creditors (holders of unsecured claims) voted 137 claims aggregating $2,018,541.49 to accept the plan as against 17 creditors holding claims aggregating $226,823.99 which voted to reject the plan. Class V creditors (holders of interest) voted 56% of the total shares to accept the plan and 44% of the total shares to reject the plan. Thus, Class V holders of interest did not accept the plan since two-thirds in amount is required for acceptance under Code § 1126(d).

7. The book value of the debtors' assets amounts to approximately $4,224,000. The liabilities total $5,108,000. If effect were not given to the reduction of indebtedness as a result of the provisions of the amended plan, there would be a shareholder deficiency of approximately $1,185,000, so that in essence, the interests of all the shareholders should be wiped out. The common stock of TSW carries no fixed liquidation preference or no fixed redemption price.

8. As part of the negotiations for a plan of reorganization, the creditors' committee demanded an infusion of new capital. William Langus, the president of TSW, was able to enlist his cousin, Hyman Raskin, to fund the plan by advancing $300,000 for new working capital, in consideration for which Mr. Raskin would receive 100 percent of the stock of the reorganized corporation. It is contemplated that William Langus and his son, Marc Langus, would continue to manage the debtors as salaried officers and employees, but their stock interest would be cancelled, along with the stock interests of the objecting shareholders.

William Langus, the president of TSW, was the founder of the company and is experienced in the business of retailing toys and sporting goods. His son, Marc Langus, is the treasurer of TSW and is familiar with the debtors' financial structure and its marketing operations. Their continuance in office is consistent with the interests of the debtors' creditors and the concept of successful reorganization. Moreover, their continuance in office does not offend any public policy interests.

9. If effect were given to the reduction of indebtedness as a result of the provisions of the amended consolidated plan, the pro forma balance sheet would reflect an equity of $1,939,000. However, during the first year of the amended plan, the debtors are required to pay 7 percent to creditors, apart from the 13% due on confirmation, or an additional $294,000. The debtors are also required to pay a total of $45,000 over the first nine months of the plan with respect to the unpaid state sales tax claims. Assuming that the debtors remain profitable for each of the four years they will operate under the amended consolidated plan, after making the required plan payments, there will probably be no return to the funder, Mr. Raskin, for his $300,000 investment. Although the pro forma balance sheet would reflect an equity of $1,939,000 after giving effect to the reduction in indebtedness as a result of the provisions of the amended consolidated plan, the funder is taking a calculated risk as to his investment in the debtors' future operations.

10. The financial worth of the funder, Mr. Raskin, is not relevant since his $300,000 capital contribution has already been put in escrow with the attorneys for the debtors, who presently hold in escrow the sum of $783,000, of which $546,000 represents the 13 percent immediately payable to Class IV creditors upon confirmation.[1]

---

1. Under the plan, provision is made for 10% payment to Class IV creditors upon confirmation, with an additional 3% due on January 10, 1984. Since the plan will be confirmed after

11. If this consolidated case were converted to liquidation under Chapter 7 of the Bankruptcy Code, the unsecured claims might receive approximately 15.8 percent, apart from possible preference recoveries. If all possible recovery for potential preferential transfers were added, the return to general unsecured creditors would increase to approximately 25 percent, although such avoidance litigation under Code § 547 would be time-consuming, speculative and would delay distribution to creditors. In any event, the 35 percent realizable by the unsecured creditors under the amended consolidated plan would be greater than the amount such creditors would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

12. The projected operations for the debtors' first post-confirmation fiscal year reflect a net profit of approximately $291,000 on sales of $6,900,000. The debtors previously achieved a net profit of $202,000 on sales of $14,365,000. The fact that on more than double the sales in the previous year the debtor achieved a net profit of $202,000, which is less than the projected $291,000 profit figure, was satisfactorily explained. The debtors' problem centered upon a high overhead, which was alleviated by the closing of half its retail stores and the sale of store leases. The debtors' projected net profit of $291,000 for its first post-confirmation year is predicated on a 31 percent profit margin. The accountant for the creditors' committee testified that the normal profit margin in the retail toy industry ranged between 30 percent and 35 percent and that the debtors' 31 percent projection was realistically attainable. It further appears that the debtors' projected sales, costs and assumptions are reasonable, subject to the uncertainties of the toy business, the debtors' ability to obtain credit post-confirmation and its ability to continue to use and occupy its "flagship store" in Hartsdale, New York, which is presently in litigation.

13. From the foregoing, it is reasonable to conclude that with the infusion of $300,-000 of additional capital and with a projected net profit of $291,000 after giving effect to the reduction of indebtedness as a result of the provisions of the amended consolidated plan, a confirmation of the plan is not likely to be followed by the liquidation of the debtors, or the need for further financial reorganization, as described under Code § 1129(a)(11). In short, the proposed reorganization appears to be feasible.

### SHAREHOLDER OBJECTIONS

■ The minority shareholders state in their objections to confirmation:

> The cancellation of their stock and the issuance of all the stock of the corporation to the funder for $300,000 is neither fair nor equitable as the company has, upon confirmation, a net worth of $1,955,-000.

This objection elides the fact that the debtors' liabilities of $5,108,000 presently exceed its assets of $4,224,000 and that there is no equity for any of the debtors' current shareholders. The unsecured creditors will not be paid in full. Their consent to accept a 35 percent deferred payment for their allowed claims is premised on the fact that the debtors' present shareholders will not receive anything for their interests. Had the unsecured creditors not consented to this arrangement, they could not be required to accept less than full payment of their allowed claims as long as a holder of a junior interest, such as a shareholder, retained any equity interest in the debtors. This is so because the "fair and equitable" test, as applied to unsecured claims, provides under Code § 1129(b)(2)(B)(ii) that if the unsecured creditors are not paid in full "the holder of any . . . interest that is junior to the claims of such class will not receive or retain on account of such junior . . . interest any property."

That a pro forma net worth of approximately $1,900,000 is produced after confir-

the date of the first installment to creditors, the amount due on confirmation will include the

3% installment for a total of 13%.

mation as a result of giving effect to the reduced indebtedness of the debtors under the plan, does not mean that the new investor thereby receives a windfall. This balance sheet equity is subject to the payments required by the plan, the risks of the toy market and the debtors' ability to continue to operate successfully following confirmation. Indeed, even existing shareholders are entitled to receive equity interests in exchange for new investments after the cancellation of their former equity shares. *In re Landau Boat Co.,* 13 B.R. 788, 792, 7 B.C.D. 1367, 1369 (Bkrtcy.W.D.Mo.1981); *Buffalo Savings Bank v. Marston Enterprises, Inc.,* 13 B.R. 514, 518, 7 B.C.D. 1403, 1406 (Bkrtcy.E.D.N.Y.1981). Here, the outside funder is taking a calculated risk and is entitled to receive, with the consent of the unsecured creditors, 100 percent of the common stock of the post-confirmation debtors. That is what reorganization is all about.

■ The remaining two objections which withstood dismissal from the bench are as follows:

The plan does not conform to Section 1129(c) of the Bankruptcy Code in the treatment of the States Sales Tax as it does not assure that the State "will receive" its taxes but substitutes a promise over six years for the existing priority debt. This debt as the court is aware is a personal liability of the objectants.

\* \* \* \* \* \*

The plan as to its proposed consolidation should not be approved as the five leaseholds that were sold for a total of $95,000 by five subsidiary corporations did not apply any of the proceeds to the payment of sales taxes, their only debt. Rather, the proceeds were taken into the parent and used for operations and overhead. This action increased the personal liability of the objectants for sales taxes and these funds should be applied to the direct reduction of this liability.

These two objections essentially relate to the feasibility of the plan, which calls for the deferred payment of sales tax claims over a period of six years, as permitted under Code § 1129(a)(9)(C).

The objecting minority shareholders are concerned because their personal exposure for the debtors' unpaid sales taxes will continue unless and until such taxes are paid during the deferred six year period under the plan. However, the present majority shareholders, whose equity interests will also be cancelled pursuant to the proposed reorganization, will likewise remain personally liable for such taxes. The debtors' management, with the concurrence of the creditors' committee, determined that as a matter of business judgment a successful reorganization could be achieved if the proceeds from the sales of five leaseholds were used for operations and in furtherance of the plan rather than for immediate repayment of the sales tax claims. The deferred payment of taxes is specifically authorized under Code § 1129(a)(9)(C) which states that the plan may provide that

(C) with respect to a claim of a kind specified in section 507(a)(6) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

Accordingly, the deferred payment of the state sales tax claims over a period of six years, as permitted under Code § 1129(a)(9)(C), is not a cognizable objection to confirmation of the debtors' amended plan of reorganization. As long as the plan complies with the provisions of 11 U.S.C. § 1129, it is confirmable, notwithstanding the personal tax exposure of the objecting shareholders. An analogous point made in response to a creditor's objection to confirmation was noted in *In re Nite Lite Inns,* 17 B.R. 367, 372 (Bkrtcy.S.D.Cal.1982) as follows:

While it is true that if the plan is confirmed Burke Investors may have a significant tax problem, the provisions of 11 U.S.C. § 1129 do not require the court to look beyond a determination as to whether a creditor is to receive under the plan

the value of his claim as of the effective date of the reorganization.

## DISCUSSION

■ In order for a plan of reorganization to pass muster for confirmation purposes, it must comply with all the requirements of Chapter 11 as stated in Code § 1129(a)(1). This is so even if no objections to confirmation are filed. *In re Economy Cast Stone Co.,* 16 B.R. 647, 650 (Bkrtcy.E.D.Va.1981). Reference must be made to Code § 1123 with respect to the contents of a plan, and particularly to the rules with respect to classification of claims. The debtors' plan complies with Code § 1123(a)(1) in that it designates classes of claims. It specifies the classes of claims that are not impaired as required by Code § 1123(a)(2). It specifies the treatment of impaired interests, as directed by Code § 1123(a)(3) and states that the unsecured creditors will receive a 35 percent payout, whereas the shareholders' interests will be cancelled. The plan meets the test of Code § 1123(a)(4) in that the same treatment is provided for each claim or interest of a particular class. The plan also satisfies Code § 1123(a)(5) in that adequate means for the plan's execution is provided by the debtors' retention of certain retail stores, the sale of leaseholds of other stores, with the proceeds applied in part to working capital, and for a new shareholder investment of $300,000. The plan does not offend Code § 1123(a)(7) in that the debtors' post-confirmation management is not inconsistent with public policy or with the interests of creditors. The interests of its present shareholders are eliminated under the plan. Pursuant to Code § 1123(b), the plan provides that the interests of all classes senior to the unsecured creditors will be left unimpaired.

Code § 1129(a)(2) requires that the proponent of the plan must comply with Chapter 11. Thus, the proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with Code §§ 1125 and 1126.

*See* 3 W. Norton, Bankruptcy Law and Practice § 63.07 (1981). There is no question that the debtors have complied with the applicable provisions of Chapter 11.

■ The element of good faith is critical to the compliance with Code § 1129(a)(3), which states:

The plan has been proposed in good faith and not by any means forbidden by law.

Good faith is not a term that is defined by the Code and has been viewed in many ways. *See In re Victory Construction Co., Inc.,* 9 B.R. 549, 7 B.C.D. 257 (Bkrtcy.C.D. Cal.1981). In the context of reorganization under Chapter 11, a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code. *Connell v. Coastal Cable T.V., Inc.,* 709 F.2d 762, 764 (1st Cir.1983); *In re Nite Lite Inns,* 17 B.R. at 370. Thus, the court may consider a debtor's pre-filing conduct as well as the feasibility of the plan itself. *In re Madison Hotel Associates,* 29 B.R. 1003, 1009 (D.C.W.D.Wis.1983). In the instant case, the debtors' plan, which has been approved by the requisite majority of unsecured creditors, has been proposed in a good faith effort to rehabilitate the debtors' operations while repaying the unsecured claim holders more than they will receive upon liquidation. The financial assumptions are reasonable and the projections appear to be attainable. Therefore, the prerequisite of good faith has been established.

■ There is no evidence of any payments for services or expenses that have not been disclosed to the court, as required by Code § 1129(a)(4). The identity and affiliations of the two individuals who are to serve as officers of the post-confirmation debtors, namely William Langus and his son, Marc Langus, have been disclosed, as well as the amount of compensation they are to receive as required by Code § 1129(a)(5). *Cf. In re Polytherm Industries, Inc.,* 33 B.R. 823, 829 (D.C.W.D.Wis. 1983) (case remanded where record did not contain proposed compensation of insiders in reorganized corporation as required by Code § 1129(a)(5)(B)). There is no evidence

that the continued service of the debtors' current management is inconsistent with the interests of creditors, equity security holders or public policy, as expressed in Code § 1129(a)(5)(A)(ii). The objecting shareholders, who are the son and son-in-law of the debtors' president, William Langus, have not presented any evidence to dispute the continuation of the present management. William Langus was the founder of the business, and was its operating officer for approximately twenty-five years. The evidence presented by the objecting creditors does not relate to the inadequacy of current management. Instead, they question management's decision not to satisfy the unpaid sales tax liability and to use the proceeds on hand for business purposes. This issue is a matter of business judgment which has been approved by the unsecured creditors and does not constitute bad faith or inadequacy of current management.

■ The so-called best interests test, which is incorporated in Code § 1129(a)(7), must also be met in order to achieve a confirmation under Chapter 11. Subsection (7) focuses upon each holder of a claim, as distinguished from the class in which the claim is placed. Pursuant to clause (A)(i), the standard is satisfied with respect to each holder of a claim or interest who has accepted the plan. In the instant case, the holders of claims in Classes I through III are not impaired, with the result that they are deemed to have accepted the plan pursuant to Code § 1126(f). Although the requisite majority of unsecured claim holders in Class IV have accepted the plan, such acceptance was not unanimous. As to the dissenting unsecured claim holders, it has been established that they might expect to receive upon liquidation a recovery of approximately 25 percent including potential preference recoveries, see *In re The Duplan Corp.,* 9 B.R. 921, 930–31 (D.C.S.D.N.Y. 1980), whereas they will receive 35 percent under the plan plus 50 percent of the debtors' net profits, if any, credited against the debtors' obligations in inverse order of the date of payment. Thus, all the unsecured claim holders will receive under the plan on account of their claims as of the effective date of the plan "not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 ...." 11 U.S.C. § 1129(a)(7)(A)(ii). Therefore, the best interests test has been met with respect to the unsecured claim holders in Class IV under the plan.

■ The debtors' equity shareholders in Class V are impaired under the plan because they will be wiped out and all of the stock of TSW will be cancelled. This feature does not offend the best interests test in Code § 1129(a)(7) since the debtor is insolvent and there is no equity interest to preserve. The point was noted by Congressman Edwards who said:

> [If stockholder] interests are "under water" then they will be valueless and the plan may be confirmed notwithstanding the dissent of that class of interests even if the plan provides that the holders of such interests will not receive any property on account of such insterests.

124 Cong.Rec. 32408 (1978) (remarks of Rep. Don Edwards).

■ Code § 1129(a)(8)(A) has been satisfied because Classes I through III of the plan are deemed to have accepted the plan since they are unimpaired. The unsecured claim holders in Class IV have affirmatively accepted the plan. The acceptance of the shareholders in Class V is not required because they will be crammed down and wiped out under the absolute priority rule incorporated in Code § 1129(b).

The requirements of Code § 1129(a)(9) have been satisfied under the plan. The administrative and priority claims specified in Code § 507(a) will receive cash equal to the allowed amount of such claims on the effective date of the plan, or as otherwise agreed upon, as required by subsections (A) and (B). The state sales tax claims, which are the only tax claims involved under Code § 507(a)(6), will be paid deferred cash payments on a quarterly basis over a period of six years from the date of assessment of a value, as of the effective date of the plan,

equal to the allowed amount of such claims pursuant to Code § 1129(a)(9)(C).

In view of the fact that the first three classes under the plan are deemed to have accepted the plan and Class IV has affirmatively accepted the plan, the requirement in Code § 1129(a)(10) has been satisfied in that at least one class of claims has accepted the plan.

 Code § 1129(a)(11) requires a feasibility test because it must appear that confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In *In re Landmark At Plaza Park, Ltd.,* 7 B.R. 653 (Bkrtcy.D.N.J.1980), it was observed as follows:

> The factors courts should generally consider in making the [feasibility] determination are (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

7 B.R. at 659 (citation omitted). In the instant case, it was found that with the infusion of $300,000 in new capital and the reduction of the indebtedness in accordance with the plan, the debtors' capital will reflect a net worth of over $1,900,000. The operations in the first post-confirmation year should produce a net profit of approximately $291,000 based upon an anticipated profit margin of approximately 31 percent. The accountant for the creditors' committee believed that the projections were realistically attainable. The continuation of the debtors' president and founder, William Langus, assures an uninterrupted management policy based upon many years of experience in the retail toy business. The approval of the plan by the debtors' creditors bodes well in that it will be necessary for the debtors to obtain credit from the trade in order to operate profitably in the post-confirmation period. Although there is a cloud upon the debtors' ability to use

and occupy its "flagship store" in Hartsdale, New York, because the lease is subject to a pending litigation with the landlord, these negative factors alone should not preclude confirmation of the plan. The debtors' figures, which were reviewed by the accountant for the creditors' committee reflect that the debtors could operate profitably even if the Hartsdale lease were lost. In any event, it does not appear that confirmation of the plan would be followed by liquidation or the need for further financial reorganization. Therefore, the feasibility test incorporated in Code § 1129(a)(11) has been satisfied.

## ELIMINATION OF SHAREHOLDERS

Unlike many instances where the proponents of a plan of reorganization seek to preserve the interests of shareholders, the plan in question completely eliminates all of the equity interests and cancels their shares. This proposal is in recognition of the economic fact that the debtors are insolvent and that there are no equity interests to be preserved. The objecting shareholders, understandably, have not consented to the plan and accordingly, their interests are impaired in that they will be wiped out. When an impaired class of creditors or interests does not consent to the plan, consideration must then be given to the two standards contained in Code § 1129(b).

## THE PLAN DOES NOT DISCRIMINATE UNFAIRLY

 One of the prerequisites to confirmation under Code § 1129(b) is that the "plan does not discriminate unfairly." This phrase has been described as follows:

> The requirement is intended to be complementary to the fair and equitable test and to permit the court to evaluate the complex relationship inherent in the relative priority of classes caused by partial subordination. In a nutshell, if the plan protects the legal rights of a dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not

discriminate unfairly with respect to the dissenting class.

Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 133, 141–42 (1979) (footnotes omitted). Manifestly, the holder of a claim or interest may not be singled out and subjected to unfair and discriminatory treatment. *See North Central Development Co. v. Landmark Capital Co.,* 27 B.R. 273, 279 (Bkrtcy.D.Ariz.1983). Nor may a plan give insiders the same priority as unsecured creditors. *In re Economy Cast Stone Co.,* 16 B.R. at 651. However, a plan does not discriminate unfairly merely because it would cause significant tax problems for an impaired class of creditors or interests who would obtain greater tax benefits through a liquidation of the debtor. *See In re Nite Lite Inns,* 17 B.R. at 372. That the objecting shareholders' personal liability for unpaid sales taxes is not immediately satisfied under the amended plan of reorganization does not mean that the plan discriminates unfairly against them.

## FAIR AND EQUITABLE

■ The second requirement for confirmation where there is an impaired non-accepting class of creditors or interests is the doctrine of absolute priority as reflected in the requirement under Code § 1129(b)(2) that the plan must be "fair and equitable." This is a modified version of the absolute priority rule because it only applies to dissenting classes rather than to all classes or the plan as a whole. *See* Klee, *supra,* at 141. The fair and equitable rule requires that a plan must provide either that an impaired non-accepting class of creditors be paid in full with respect to their claims, or that no interest junior to that class of creditors receive any distribution under the plan with respect to the junior claimants' prepetition claims or interests. *See* 11 U.S.C. § 1129(b)(2)(B). This point was expressed as follows:

> Inherent in the "fair" and "equitable" standards is the doctrine of absolute priority. This doctrine provides that creditors and shareholders may participate in the debtor's assets only in accordance

with their respective priorities, and that senior classes must receive full compensation for their claims before other classes can participate. *Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941); *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Implicit in this rule is that stockholders cannot participate in a reorganization plan unless it is established that the debtor is solvent.

*In re The Duplan Corp.,* 9 B.R. at 924–25; *see also In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 832–33 (Bkrtcy.S.D.N.Y. 1982) (general and limited partners of debtor not entitled to retain partnership interests where senior status mortgagee would not receive the indubitable equivalent of its deficiency claim); *In re Landau Boat Co.,* 8 B.R. at 437–38 (absolute priority rule violated where plan allowed shareholders to retain equity interests, while unsecured creditors received only 10% payout).

■ In this case, the unsecured claim holders consented to a 35 percent distribution on condition that the debtors' shareholders would be eliminated. Had the shareholders attempted to reserve their equity interest over the dissent of the unsecured class, the plan could not be confirmed because the fair and equitable test would not have been met. However, the fair and equitable test need not be applied to the unsecured class because they consented to the plan, which calls for the cancellation of the equity shareholders' interests.

The only non-consenting impaired class in this case is Class V, namely the equity shareholders. In applying the fair and equitable test as to this class, reference must be made to Code § 1129(b)(2)(C), which provides that the equity shareholders must receive, as of the effective date of the plan, the greatest of any fixed liquidation preference, or any fixed redemption price or the value of the shares before any junior interests receive or retain any value under the plan. The fair and equitable doctrine is not implicated in connection with the cancellation of the equity shareholders' interests in

this case because their shares do not carry any fixed liquidation value or any fixed redemption price. Moreover, no interests junior to the shareholders are involved under the plan. The equity shareholders may be crammed down in this case simply because the debtors are insolvent and the shares in question have no value. This point was succinctly stated in 3 W. Norton, Bankruptcy Law and Practice, as follows:

> If there is no fixed liquidation preference or redemption price, then the interest can be crammed down by giving the holder of the interest property of a value, as of the effective date of the plan, equal to the value of the interest.

> * * * * * *

> The legislative history indicates that if the debtor is insolvent the interest will have no value and nothing need be paid.

*Id.* at § 63.29, at 49.

## CONCLUSIONS OF LAW

1. The shareholders' objections to confirmation are dismissed.

2. The amended consolidated plan of reorganization satisfies all the applicable requirements expressed in Code § 1129(a)(1) through (11).

3. The plan does not discriminate unfairly.

4. The plan is fair and equitable with respect to the non-consenting impaired equity shareholders included in Class V.

5. The proposed order of confirmation will be signed.