In re WESTPOINTE, L.P., a Missouri Partnership d/b/a Westpointe Apartments.

Northwest Village Limited Partnership, Grandview Hills Limited Partnership, Parkridge Apartments Limited Partnership, Lamplite Limited Partnership and Westpointe Limited Partnership, Appellants,

v.

William E. Franke, Gannon Management Company of Missouri, Prairie Properties L.L.C., and James S. Cole, Office of the U.S. Trustee, Appellees.

Northwest Village Limited Partnership, Grandview Hills Limited Partnership, Parkridge Apartments Limited Partnership, Lamplite Limited Partnership and Westpointe Limited Partnership, Appellants,

v.

Prairie Properties, L.L.C., Cynthia J. McNeill, James S. Cole, Office of the U.S. Trustee, and Susman, Shermer, Rimmel and Shifrin, Appellees.

William E. Franke, Gannon Management Company of Missouri, Cross–Appellants,

v.

Northwest Village Limited Partnership, Grandview Hills Limited Partnership, Parkridge Apartments Limited Partnership, Lamplite Limited Partnership and Westpointe Limited Partnership, Cross–Appellees.

No. 4:92CV1381–SNL.

United States District Court, E.D. Missouri, Eastern Division.

May 26, 1999.

F. Guthrie Castle, Jr., Memphis, TN, Terry L. Pabst, Esq., St. Louis, MO, Gerald A. Rimmel, Susman & Schermer, Clayton, MO, Thomas M. Blumenthal, Paul & Camazine, Clayton, MO, Norah J. Ryan, St. Louis, MO, Mitchell A. Margo, Curtis & Oetting, St. Louis, MO, for Debtor/Appellants.

Randall C. Cahill, Cahill & Associates, St. Louis, MO, Glenn D. Gillett, U.S. Dept. of Justice, Washington, DC, Samuel Rosenthal, Curtis & Mallet–Provost, Washington, DC, Charles F. Dufour, Jr., Becker & Dufour, St. Louis, MO, Thomas G. Berndsen, Berndsen Law Offices, St. Louis, MO, Jeffrey K. Fischer, Missouri Dept. of Revenue, General Counsel's Office, Jefferson City, MO, Phyllis Schauffler, Husch & Eppenberger, St. Louis, MO, Greg Lowry, Locke & Purnell, Dallas, TX, for Appellants.

Leonora S. Long, U.S. Dept. of Justice, Office of Trustee, St. Louis, MO, Dana McWay, U.S. Bankruptcy Court, St. Louis, MO, for Trustee.

### *MEMORANDUM OPINION*

LIMBAUGH, District Judge.

This matter is before the Court on cross-appeals from orders of the Bankruptcy Court confirming a Chapter 11 reorganization plan and valuating the bank-

ruptcy estates. The action has a long and complex history. The action commenced on September 7, 1990, with the filing by five limited partnerships, each of which owned an apartment complex, of petitions for voluntary bankruptcy under 11 U.S.C. § 1129, after the partnerships defaulted on HUD mortgages. Each partnership consisted of two general partners—Pentad Properties, Inc., and Kevin Kelly—each with a ½% share, and one limited partner—St. Louis Associates, Ltd. (SLA), a limited partnership.

The properties were previously owned by William E. Franke, who purchased them in 1983 for approximately $38,000,-000. In 1984 Franke sold the properties to SLA for approximately $57,300,000. Kelly was a general partner of SLA. This purchase was financed, in part, through SLA's execution of a promissory note in favor of Franke in the amount of $57,300,-000, secured by a second mortgage in the properties.[1] SLA entered into a contract with the Gannon Management Corp. (GMC), owned by Franke, to manage the properties.

In 1988–89 the properties were refinanced under § 223(f) of the National Housing Act, 12 U.S.C. §§ 1701, et seq. (repealed 1990), pursuant to which the Department of Housing and Urban Development (HUD) would coinsure loans made by private lenders. The purpose of the coinsurance program was to make below-market mortgages available to preserve and modernize existing multi-family housing. The Act required that each property be owned by a single entity. Accordingly, the Debtor partnerships were formed and SLA sold one of the properties to each of these partnerships.

Carnegie Evans Corp. was the private lender and coinsurer of the refinancing and refinanced the properties for a total of approximately $62,500,00, with approximately $14,000,000 of the loan proceeds set aside in "non-operating" escrow funds for repairs, operating deficits, and additional collateral to secure the lender against uninsured losses. The refinancing deeds of trust were given first priority lien status against the properties. The security agreements granted Carnegie Evans a security interest in "all property ... which is owned by the Debtor or becomes the property of the Debtor hereafter [including] all ... cash; bank accounts; ... rents; rights (if any) to amounts held in escrow; ... judgments; liens and cause of action." (Gannon/Franke valuation hearing Exh. 46.)

Carnegie Evans raised money for the loans through the mortgage-backed securities program of the National Housing Act, § 1721(g), by selling Government National Mortgage Association (GNMA) certificates to Boatman's Bank in Boatman's capacity as Trustee for the Industrial Development Authority Trust of St. Louis County. Boatman's, in turn, raised funds for the certificates through the sale of industrial bonds. As a condition of obtaining a letter of credit from another bank as collateral for the bonds, a Bond Stabilization Fund was set up with a percentage of the monies from the sale of the GNMA certificates. If the bonds were paid off, money remaining in the Stabilization Fund was to be disbursed to Debtors.

Immediately after the closings, Carnegie Evans endorsed the notes and assigned the deeds of trust and security agreements to GNMA. Carnegie Evans was designated as the servicer of the loans, and Debtors contracted with GMC to continue managing the properties. In April 1990 Debtors did not make the scheduled debt service payment to GNMA. GNMA declared the loans in default and assigned them to HUD, and Debtors initiated this action for bankruptcy. The unpaid balance on the HUD mortgages totaled approximately

---

1. In 1986, Franke assigned the note and deed of trust to Mercantile Bank as security for a prior indebtedness to that bank.

$65,000,000; the amount owed on the SLA note in favor of Franke was approximately $9,000,000. HUD, Franke and GMC filed proofs of claims against the estate.

Debtors filed adversary proceedings in the Bankruptcy Court against Gannon/Franke and against HUD and Carnegie Evans. The gravamen of the adversary proceedings was that escrow funds were wrongfully disbursed by Carnegie Evans for the personal use and benefit of Franke, and that HUD knew, but failed to inform Debtors, of mismanagement of the loans by Carnegie Evans. Debtors sought to have the transfers to Franke set aside as fraudulent or preferential. They claimed that the dissipation of the escrow funds led to Debtors' default, thus entitling them to be excused of the default, to the turnover of assets, and/or to reformation of some of the loan documents.

After the filing of the bankruptcy petitions, GNMA paid off the GNMA certificates to Boatman's Bank, and Boatman's Bank used these proceeds to pay off the bonds. The $330,702 in the Bond Stabilization Fund was transferred to Debtors.

Debtors and Gannon/Franke filed different reorganization plans, with HUD accepting the Gannon/Franke plan. The Gannon/Franke plan, as amended and modified, divided claims and interests into eleven Classes—seven of these would be unimpaired while four would be impaired. The bankruptcy estate[2] was to be conveyed from Debtors to Gannon Partnership 19 (GP 19), a new entity to be formed with Franke as the managing general partner, and his children and various officers of GMC as limited partners. GP 19 would assume payment of the outstanding balance and interest of the HUD notes, and Franke would pay HUD, listed in the plan as an impaired creditor, an additional $4,510,000. HUD contended Franke owed HUD this money because it was disbursed to him by Carnegie Evans from the escrow funds in violation of HUD regulations. These monies were the same disburse-

ments challenged in Debtors' adversary proceeding against Franke. The plan further provided that after payment of the $4,510,000, HUD would receive an additional "contingent interest"—25% of net proceeds from any sale or refinancing of any of the properties. Several Classes—holders of allowed secured and unsecured claims—were to be paid in full by GP 19. Class 11, the holders of partnership interests in Debtors, was an "impaired class" which would receive no distribution.

On June 22, 1992, following an evidentiary hearing, the Bankruptcy Court confirmed the Gannon/Franke plan. The Court found that the plan was feasible and had been proposed in good faith, with no evidence of any side agreements between the Gannon/Franke and any creditors. The Court also found that each holder of an interest that did not accept the plan would receive under the plan no less than such holder would receive if Debtors were liquidated under Chapter 7 of the Bankruptcy Code, and that the plan did not discriminate unfairly against, and was fair and equitable with respect to, Class 11.

Debtors appealed confirmation of this plan; their motions for a stay pending appeal were denied. On appeal, Debtors' main argument was that the plan was not "fair and equitable" to the dissenting Class 11 interest-holders, as required by 11 U.S.C. § 1129(a) and(b), for "cram down" plans—that is, plans confirmed over the objections of an impaired class. Debtors argued that it was unfair for HUD to get full payment on its debt plus a share of potential future profits from the properties, and for GP 19 to acquire the properties at no risk of liability, while all of Debtors' interests in the properties were extinguished.

On February 10, 1993, the Bankruptcy Court entered an order in the HUD adversary proceedings, holding that Debtors had an interest in the escrow funds, but that in light of confirmation of the plan,

---

2. For clarity, the singular 'estate' is used by the parties and the Courts.

the interest was valued at zero and the remaining aspects of the proceedings were moot.

In considering Debtors' appeal this Court concluded, by order dated August 31, 1994, that it could not be determined whether the confirmed plan was fair and equitable because there was no evidence nor findings as to the value of the real property and cash assets of the estate. The Court believed that the solvency of the estate was an important issue given that the "going concern" of the estate had been assumed by a new entity which had no prior interest in the estate. The Court, accordingly, remanded the case to the Bankruptcy Court for a valuation of the bankruptcy estate as of June 22, 1992.

The Bankruptcy Court held a valuation hearing on September 9–12, 1996. Numerous witnesses provided oral testimony, and hundreds of documents were admitted into evidence. The parties stipulated to $51,553,968.21 in pre-confirmation assets of the estate. This included the fair market value of the properties valued at $38,600,-000. The total of the pre-confirmation liabilities stipulated to was $1,154,958.75. Debtors and the proponents of the confirmed plan disagreed as to the "going concern" or "reorganization value" of the properties, the value of the adversary proceedings, and the amounts of HUD's and Franke's secured claims.

The Bankruptcy Court excluded the testimony of Debtors' valuation expert witness who had been designated to testify about future cash flows and other assets of the estate as reorganized in the possession of GP 19 under the Gannon/Franke plan. The Court stated that the hearing was to be limited to "a determination of the estate's value as of the date of confirmation of the plan." This expert would have testified that the value as of July 1992 of "the economic benefit to be derived from the debtor's properties by the ownership entity over a 38 year period of ownership [the period until the loan is paid off]" was $7,711,402. This amount consisted of three components: the portion of cash flow attributable to the ownership entity; the residual value of the property at the end of the mortgage term; and the managing fee. (Debtor's valuation hearing Exh. 97.)

The Bankruptcy Court issued its valuation order on December 18, 1997. The Court reiterated its position that its role on remand was limited to determining what the value of the estates was *prior to* confirmation of the plan.. The Court reviewed the appraisals of the properties which resulted in the stipulation that their "fair market value" as of June 22, 1992, was $38,600,000. The appraiser used three methods of appraising the properties: (1) the Cost Approach which is based on the current cost of reproducing the buildings, minus depreciation, plus the cost of the land; (2) the Direct Sales Comparison Approach which compares the subject property to recent sales of similar complexes in the area, closely examining differences in location, physical qualities and financing factors; and (3) the Income Capitalization Approach which measures the present worth of "anticipated future net operating income." Under the third approach, the projected revenue for each property is developed by analyzing historic revenues, current contract rents, and comparable apartment complexes. (Appellees' valuation hearing Exh. 8 at 56.)

The appraised value of the properties as of June 22, 1992, was between $37,180,000, and $40,850,000, under the Income Capitalization Approach. The Bankruptcy Court found that the $38,600,000 figure, stipulated to by the parties, was supported by the record, and that this represented the relevant value of the properties to the estate. The Court concluded that this amount included items such as the projected future cash flow from the properties, upon which Debtors based their definition of "reorganization value."

The Bankruptcy Court concluded that because the loans were made under the National Housing Act, HUD had a perfect-

ed security interest in all property of Debtors, including post-petition rents, the $330,702 disbursed to Debtors from the Bond Stabilization Fund, and the adversary proceedings; and that these assets were, thus, not available to Debtors to fund their proposed reorganization plan. The Bankruptcy Court made the following additional valuation findings:

(1) The pre-confirmation value of the HUD adversary proceedings was zero.

(2) The pre-confirmation value to the estate of the Gannon/Franke adversary proceedings was $4,510,000. The Court ascertained this value by reference to the settlement noted above calling for Franke to repay HUD this amount for the challenged disbursements from Carnegie Evans to Franke.

(3) HUD, Franke and GMC filed timely proofs of claims, in the amounts of $64,897,724, $9,290,192.25 and $486,456.24, respectively (totaling $74,674,372.49), which were liabilities of the estate.

In sum, the Bankruptcy Court concluded that on the relevant date, the estate's assets were $56,394,669.77,[3] and their liabilities were $75,829,331.24.[4] This appeal followed. Debtors renew their argument that the plan confirmed by the Bankruptcy Court was not fair and equitable. They argue that the Bankruptcy Court erred in several valuation matters and that, in actuality, the estate was solvent, so that extinguishing their equity interests while affording HUD and GP 19 "windfalls," rendered the plan unconfirmable.

Debtors' main argument is that the Bankruptcy Court erred in considering the pre-confirmation value of the properties, and not the "reorganization value." They argue that the fair market value appraisal did not take into account the favorable financing conditions under the Gannon/Franke plan, so that the value of the properties to a third-party purchaser would be considerably less than the "reorganization value" to GP 19 or Debtors.

Debtors next argue that the confirmed plan is not fair and equitable because it pays HUD more than 100% of its secured claim, in that in addition to repayment of the loans, HUD would be entitled to 25% of the proceeds from a sale. They also assert that HUD's secured claim was actually in the amount of $38,600,000—the fair market value of the properties, and not $64,897,724—the amount due on the loans.

Debtors also challenge the Bankruptcy Court's findings that HUD had a lien on the post-petition rents from the properties ($9,377,390.61), on the monies from the Bond Stabilization Fund, on two tax refunds ($278,434.84), and on the $4,510,000 wrongfully disbursed to Franke. They argue that the Bankruptcy Court erred in allowing the Franke claim against the estate because the confirmation plan itself disallows this claim, because Franke's proof of claim was defective, and because the collateral was "fully encumbered by the first pledge to HUD." Accordingly, Debtors argue, this claim cannot be included as a liability when considering the solvency of the estate.

Lastly, Debtors argue that even if the estate is insolvent, the confirmed plan is still not fair and equitable because "it transfers control of Debtors' enterprise to GP 19 without compensating Debtors equitable interests for this right."

The Franke/Gannon parties filed a cross-appeal. In footnote 18 of their appellees' brief they explain that they filed the cross-appeal to ensure that the Bankruptcy Court's valuation of the Franke

---

3. The Bankruptcy court erred by $.44 in noting the stipulated assets as $51,553,967.77 (rather than the correct amount of $51,553,968.21). The amount as stated by the Court + $4,510,000.00 (Franke adversary proceedings) + $330,702.00 (Bond Stabilization Fund) = $56,394,669.77.

4. The $74,674,372.49 in liabilities found by the Bankruptcy Court + the $1,154,958.75 in stipulated liabilities = $75,829,331.24.

adversary proceedings not have preclusive effect in any subsequent proceedings. They contend that the Bankruptcy Court erred in valuing this proceedings at $4,510,000. They note, however, that this Court need not decide the merits of the cross-appeal which would become moot if the orders of the Bankruptcy Court's orders are affirmed. In their "reply on cross-appeal," the Franke/Gannon parties set forth in full their arguments as to why the Bankruptcy Court erred in its valuation of the Franke adversary proceedings. They argue that all the challenged transfers made by Carnegie Evans to Franke were proper. They again note that the cross-appeal would be moot if the Bankruptcy Court orders are affirmed. Debtors have filed a motion to dismiss the cross-appeal and to strike the "reply on cross-appeal," on the ground that Debtors reasonably believed the cross-appeal was waived by the Franke/Gannon parties' failure to file a cross-appeal brief, and by the language in footnote 18.

On the main appeal from the confirmation and valuation orders of the Bankruptcy Court, the Franke/Gannon parties argue that Debtors were insolvent, and that the Bankruptcy Court properly considered future cash flow in its "going concern" valuation and properly allowed the HUD and Franke claims. They argue that the confirmed plan does not provide HUD (or its successor in interest, Prairie Properties, L.L.C.) with a prohibited bonus, i.e., payments greater than the value of HUD's claim. Lastly, they argue that the equities favor affirmance since GP 19 has operated the properties successfully for the last six years. Prairie filed a separate appellee's brief. It too asserts that GP 19 has been successfully operating the properties from the confirmation date to the present.

■ This Court reviews the Bankruptcy Court's finding of fact for clear error and its conclusions of law de novo. *In re Hen House Interstate, Inc.*, 150 F.3d 868, 870 (8th Cir.1998). The valuation of assets of an estate are questions of fact

and due deference must be accorded to the trier of fact, especially when it is clear that the trier of fact carefully evaluated a voluminous record. *In re Da–Sota Elevator Co.*, 939 F.2d 654, 657 (8th Cir.1991); *see also In re Muncrief,* 900 F.2d 1220, 1223 (8th Cir.1990) (finding that debtor was insolvent is subject to clearly erroneous standard of review). Whether the method of valuation used was correct, however, is a legal question. *In re King Resources Co.*, 651 F.2d 1326, 1335 (10th Cir.1980); *In re Moulded Products, Inc.*, 474 F.2d 220, 225–26 (8th Cir.1973) (Chapter 10 reorganization case). The appellant has the burden of demonstrating why a finding of fact is clearly erroneous. *McDowell v. Safeway Stores, Inc.*, 753 F.2d 716, 717 (8th Cir.1985).

■ Chapter 11 of the Bankruptcy Code contemplates that a reorganization plan may provide for the sale of all of the property of the estate. 11 U.S.C. § 1123(b)(4); *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1352 (5th Cir.1989) ("although Chapter 11 is titled 'Reorganization,' a plan may result in the liquidation of the creditor"); *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 654 (S.D.N.Y.1995); *In re River Village Assocs.*, 181 B.R. 795, 805 (E.D.Pa.1995) ("as a matter of law, the Bankruptcy Code permits liquidation plans in Chapter 11 proceedings").

■ The Code anticipates that not all reorganizations will proceed with the assent of all participants. The Code also anticipates that confirmation may be desirable even though one or more classes, such as an equity class whose interests will be eliminated, refuse to accept the plan. For non-consensual confirmation, or "cramdown," all the requirement of § 1129(a) must be met with the exception of subsection (8) (acceptance by all classes); in addition § 1129(b)(1) requires that as to the dissenting class, the plan be "fair and equitable" and not "discriminate unfairly." In § 1129(b)(2), the Code provides specific examples of possible fair and equitable treat-

ment. *See generally* 7 Collier on Bankruptcy § 1129.03–.04 (15th ed.1999).

Section 1129(b)(2)(C)(ii) provides that a plan is fair and equitable if the holder of any interest junior to the dissenting impaired class will not receive or retain any property under the plan. In the present case it is undisputed that there are no interests which are junior to Class 11. Thus the confirmed plan satisfies this section.

 In *Case v. Los Angeles Lumber Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, (1939), the Supreme Court explained that the words "fair and equitable" are words of art that have a special meaning when used in the context reorganization cases. To be "fair and equitable," plans must recognize that the debtor's interest in the property "is subordinate to the rights of creditors; first of secured and then of unsecured creditors." *Id.* at 116. "The 'fair and equitable' requirement [of § 1129(b)] does not look towards protection of debtor interests, but rather toward protection of dissenting creditor interests, absent the value of the ongoing business being large enough to support protection of the debtors." *In re Koelbl,* 751 F.2d 137, 140 (2d Cir.1984).

 When a plan extinguishes equity interests, a principal "fair and equitable" consideration is whether the debtor is insolvent. *E.g., In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 152–53 (Bankr. S.D.N.Y.1984). Under the rule of priorities, "if the corporation is insolvent, the shareholders may not participate in the reorganized corporation." *In re Moulded Products, Inc.,* 474 F.2d at 225. The debtor is insolvent if "the aggregate amount of its property, as measured by its going concern value, is insufficient to pay its debts." *Id.*

Debtors rely on *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), to support its argument that the Bankruptcy Court erred in the valuation of the "going concern" of the properties. In that case, the Chapter 11 debtor was a company engaged in transporting freight on seagoing vessels. The Bankruptcy Court, relying only on the debtor's past earnings, found that the debtor was insolvent and confirmed a reorganization plan that excluded the debtor's stockholders. The Supreme Court held that because the record "showed that the past earning record was not a reliable criterion of future performance ... the sound evaluation of the company as a going concern required examination of the future prospects of the company." *Id.* at 452–453, 88 S.Ct. 1157. Specifically, the Court noted, the debtor "was engaged in a hotly competitive market, a market experiencing a severe rate war which would probably alter the relative standings of the competitors. The market as a whole was witnessing substantial technological change, and [the debtor] itself was one of the prime innovators. [The debtor']s principle market ... was undergoing considerable expansion." *Id.* at 452, 88 S.Ct. 1157.

 In the present case, there is nothing in the record to suggest that the Income Capitalization Approach, relied upon by the Bankruptcy Court, was not an appropriate valuation method. This method adequately took into account anticipated future profits. *Cf. In re King Resources Co.,* 651 F.2d at 1335–36 (capitalization of future earnings was proper method of valuation). Thus, there was no reversible error in the Bankruptcy Court's rejection of Debtor's proffered valuation expert testimony.

 The Bankruptcy Court correctly held that HUD had a security interest in postdefault rents upon the recording of the mortgage which contained an assignment of rents provision. *See Indian Motocycle Assocs. III Ltd. Partnership v. Massachusetts Housing Fin. Agency,* 66 F.3d 1246, 1254 (1st Cir.1995) (under federal common law, security interest of HUD in post-

default National Housing Act rents is perfected by recording HUD mortgage containing assignment of rents); *United States v. Landmark Park & Assocs.,* 795 F.2d 683, 685–86 (8th Cir.1986) (rights of federal agencies lending funds by authority of federal legislation are derived from federal not state law; predefault recording by HUD of documents containing rent assignment provision gave HUD perfected security interest in postdefault rents).

The Court finds no error of fact or law in the Bankruptcy Court's rulings with regard to the Bond Stabilization Fund, the tax refunds, and the Franke adversary proceedings. These are all property subject to HUD/Prairie's liens. In sum, the Bankruptcy Court committed no reversible error in its findings and conclusions that the estate was insolvent. The Court has considered Debtor's remaining arguments and finds them to be without merit.

Accordingly, the orders of the Bankruptcy Court are affirmed. The Gannon/Franke parties's cross-appeal is dismissed as moot.