
**In re TEXACO INC., Texaco Capital Inc., Texaco Capital N.V., Debtors.**

**Bankruptcy Nos. 87 B 20142 to 87 B 20144.**

United States Bankruptcy Court, S.D. New York.

March 23, 1988.

Weil, Gotshal & Manges, Cravath, Swaine & Moore, New York City, for debtors.

Stutman, Treister & Glatt, P.C., Los Angeles, Cal., Levin & Weintraub & Crames, New York City, Baker & Botts, Houston, Tex., Richards, Layton & Finger, Wilmington, Del., for Pennzoil Co.

Kramer, Levin, Nessen, Kamin & Frankel, New York City, for General Committee.

Keck, Mahin & Cate, Chicago, Ill., for Equity Committee.

Gordon Hurwitz Butowsky Weitzen Shalov & Wein, New York City, for the Icahn Group.

Sidley & Austin, Los Angeles, Cal., for Lester C. Olsen, trustee ad litem of the Sarah Getty Trust.

James L. Garrity, Jr., Asst. U.S. Atty., New York City, for I.R.S.

Diepenbrock, Wulff, Plant & Hannegan, Sacramento, Cal., for California Public Employees' Retirement System.

Bernstein, Litowitz, Berger & Grossman, New York City, for various shareholder derivative plaintiffs.

Harvey Greenfield, New York City, for Barnett Stepak, plaintiff in derivative action in the Delaware Chancellery Court.

Dechert Price & Rhoads, New York City, for Getty Bd. of Directors.

Lasky, Haas, Cohler & Munter, P.C., San Francisco, Cal., for Gordon P. Getty.

Wachtell, Lipton, Rosen & Katz, New York City, for J. Paul Getty Trust and Harold Williams.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for New York Life Ins. Co.

### DECISION ON CONFIRMATION OF SECOND AMENDED PLAN

HOWARD SCHWARTZBERG, Bankruptcy Judge.

After less than one year from the filing of their administratively consolidated Chapter 11 cases in this court on April 12, 1987, the debtor, Texaco Inc. and its two wholly owned financial subsidiaries, Texaco Capi-

tal Inc. and Texaco Capital, N.V., scheduled hearings commencing March 22, 1988 for the confirmation of their Second Amended Joint Plan of Reorganization (the "Plan"). The Plan was proposed by the debtors and Pennzoil Company ("Pennzoil"). Pennzoil is the largest unsecured creditor of Texaco Inc. as a result of a jury verdict entered in its favor against Texaco in the state court in Harris County, Texas, on November 19, 1985 in the amount of $7.53 billion in compensatory damages and $3 billion in punitive damages. On December 10, 1985, the trial court entered a judgment against Texaco Inc. in the amount of $11.12 billion. On February 12, 1987, the Court of Appeals for the First Supreme Judicial District of Texas affirmed the judgment of the trial court, except for the $3 billion punitive damage award, which it deemed excessive by $2 billion. Pennzoil subsequently filed a remittitur in respect of $2 billion of the punitive damages awarded. On November 2, 1987, the Texas Supreme Court refused Texaco's application for a writ of error without a hearing, no reversible error having been found. Texaco does not have an absolute right of review by the United States Supreme Court, because the only remaining avenue of direct review is by way of a petition for a writ of *certiorari* to the Supreme Court, which is discretionary. The Pennzoil judgment against Texaco Inc. is the largest civil judgment in history. Similarly, these Chapter 11 cases are the largest bankruptcy cases ever filed in this country.

In accordance with a Stipulation and Agreement dated December 19, 1987, Texaco Inc. and Pennzoil agreed to propose a Joint Plan of Reorganization pursuant to which Pennzoil would agree to accept from Texaco Inc. the sum of $3 billion in settlement of its state court judgment, which currently exceeds $11.259 billion in principal and interest. This settlement followed on the heels of this court's rulings on December 2 and 8, 1987 that Texaco's plan exclusivity under 11 U.S.C. § 1121 could be modified on motion with 48 hours notice if the General Committee of Unsecured Creditors, the Equity Committee and Pennzoil could agree upon a plan, with input from Texaco.

On December 21, 1987, Texaco and Pennzoil filed with this court their Joint Plan of Reorganization. In addition to a $3 billion payment by Texaco to Pennzoil, the Plan in general provides for the payment in full of all allowed claims of creditors against the debtors, together with interest to the date of payment or, in the case of certain debt obligations, the reinstatement of such debt obligations by curing all arrears in payment of principal and interest (including interest on any past due interest payments) and by the continued payment of all such obligations in accordance with their original terms and maturities. Under the Plan, Texaco shareholders will retain their equity interests. For purposes of the Plan, the proponents agree that the shareholders are deemed impaired and, therefore, they may vote to accept or reject the plan.

The Plan designates seven Classes of Claims and one Class of equity interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various claims and equity interests. The provisions of the Plan are, in general, as follows:

1. **Administrative Claims.** The Plan provides that the holders of administrative expense claims against the Debtors will be paid in full, in cash, on the Effective Date or on such other terms as may have been or may be agreed to between the holder of such Claim and the respective Debtor.

2. The "Effective Date" is the first business day that is at least fifteen (15) days after entry of the order confirming the Plan, provided that no stay of the Confirmation Order is in effect and that all conditions to the Effective Date provided in the Plan have occurred or been waived. Payments to be made on the Effective Date will be made on the Effective Date or as soon as practicable thereafter, but in no event more than ten days after the Effective Date. Payments to be made in cash under the Plan will be made by check or wire transfer or as otherwise required or provided in applicable agreements.

3. **Tax Claims.** The Plan does not impair holders of Tax Claims. All Claims for taxes not paid will not be discharged and will survive the Reorganization Cases as if they had not been commenced. All Allowed Claims for taxes under the Bankruptcy Code will be paid in full, in cash, on the Effective Date, together with post-petition interest at the rate and for the period provided by applicable law. Any Tax Claims which are not Allowed Claims will be resolved by the administrative and/or judicial tribunals in which they would have been resolved had the Reorganization Cases not been commenced.

4. The Debtors do not believe that there exist any Allowed Claims entitled to priority under the Bankruptcy Code other than Tax Claims. To the extent any such Allowed Claims exist, however, they will be paid in full, in cash, on the Effective Date together with post-petition interest from April 12, 1987 (the "Filing Date") to the date of payment at the rate specified in any applicable agreement or applicable law, or, if no such rate is provided, at the rate of nine percent (9%) per annum.

5. **General Unsecured Claims.** Except for Allowed Claims relating to debt for borrowed money or similar claims, all Allowed Claims of general unsecured creditors will be paid in full, in cash, on the Effective Date, together with post-petition interest at the rate provided under any applicable agreement or applicable law, or, if no such rate is provided, at the rate of nine percent (9%) per annum. Such Allowed Claims will bear post-petition interest from the date of the Filing Date or the date on which the underlying claim would have been paid under any applicable agreement or applicable law, through and including the date of payment.

6. **Unmatured Debt Claims.** Claims in respect of the Debtors' debt obligations which have not matured by their terms prior to the Effective Date (without regard to the occurrence of any defaults or any right of acceleration) will be reinstated as of the Effective Date by the curing of all monetary defaults and the continued payment of all such obligations in accordance with their original terms and maturity. Otherwise, the legal, equitable and contractual rights of the holders of such Claims will remain unaltered. Cure payments will include payment of all pre-petition and post-petition interest arrears and interest on unpaid interest at the non-default or non-penalty rates specified in the relevant agreements governing such obligations.

7. **Matured Debt Claims.** With respect to the debt obligations of the Debtors that matured by their terms after the Filing Date but prior to the Effective Date, the Plan provides for the payment in cash of the full amount of principal and unpaid interest accrued before or after the Filing Date together with post-petition interest on all such principal and accrued, unpaid interest at the non-default or non-penalty rate(s) specified in the relevant agreements governing such obligations.

8. **DOE and Environmental Claims.** The Plan does not impair the Claims of the United States Department of Energy (the "DOE") and the claims of any governmental unit arising under any environmental legislation (the "Environmental Claims"). All Claims of the DOE and Environmental Claims not paid will not be discharged and will survive the Reorganization Cases as if they had not been commenced. The Allowed Claims of the DOE against Texaco and allowed Environmental Claims will be paid in full, in cash, on the Effective Date together with post-petition interest at the rate and for the period provided by applicable law, or, alternatively, on such other terms as may have been or may be agreed to between the holders of such claims and Texaco. Any Claims of the DOE and any Environmental Claims that are not Allowed Claims will be resolved by the administrative and/or judicial tribunals in which they would have been resolved had the Reorganization Cases not been commenced.

9. **Guarantee Claims.** Claims against Texaco arising out of Texaco's guarantee of obligations of Texaco Capital, Texaco N.V. or any other person or entity will be reinstated as of the Effective Date. No holder of such a claim will be entitled to assert or enforce any claim against Texaco

in respect of Texaco's guarantee based upon any default which may have occurred prior to the Effective Date. The legal, equitable and contractual rights of holders of claims against Texaco based upon Texaco's guarantee of obligations of any person or entity other than Texaco Capital and Texaco N.V. will be reinstated and will not be altered or affected by the Plan. The Plan also provides that no holder of such a guarantee will be entitled to assert or enforce any Claim against Texaco or against the person or entity which is the primary obligor based upon any default resulting from the commencement of the Reorganization Cases.

10. **Pennzoil Judgment Claim.** The Plan provides for a settlement of the disputed Pennzoil Judgment Claim. Pursuant to the settlement, Texaco will pay Pennzoil $3 billion in cash, in full settlement and satisfaction of Pennzoil's claims against Texaco arising out of the Pennzoil Judgment. The settlement also resolves all controversies and disputes between Texaco and Pennzoil relating to any and all proceedings, acts or omissions, whenever occurring, in connection with, arising from, involving or relating to the acquisition or attempted acquisition of the shares of the capital stock of Getty Oil Company ("Getty Oil") by Texaco or Pennzoil including, without limitation, the following: (a) the tender offer and merger by which Texaco acquired such Getty Oil shares pursuant to the Merger Agreement dated January 6, 1984, between Texaco and Getty Oil; (b) the sale of such Getty Oil shares by the J. Paul Getty Trust pursuant to the Stock Purchase Agreement dated as of January 6, 1984, between Texaco and the J. Paul Getty Trust; (c) the sale of such Getty Oil shares by Gordon P. Getty, as Trustee of The Sarah C. Getty Trust, pursuant to the Stock Exchange Agreement dated as of January 8, 1984, and the Letter Agreement dated January 23, 1984, among Texaco, Gordon P. Getty, individually and as sole trustee and as a beneficiary of The Sarah C. Getty Trust, and the other beneficiaries thereof; (d) any breach or alleged breach of any agreement referred to in (a) through (c) above; (e) any efforts of Pennzoil to acquire any of such shares of Getty Oil; (f) any disclosures, representations or failures to disclose or represent facts and materials relating to (a) through (e) above; and (g) any suit, action, claim or proceeding relating to (a) through (f) above (collectively, the "Getty Oil Transaction").

11. **Releases, Indemnifications and Discontinuances of Derivative Actions.** Pursuant to the settlement and the Plan, Texaco and Pennzoil will release each other, and the other's predecessors, successors, assigns, present and former officers, directors, employees, agents, attorneys, accountants, investment bankers, receivers, parents, trustees, subsidiaries and affiliates, from all Claims arising out of, relating to or in connection with the Getty Oil Transaction, the Pennzoil Judgment, the Delaware Actions, the Texas Action and the Stockholder Actions. In addition, Texaco and Pennzoil will release each of the other parties involved in the Getty Oil Transaction and each such party's present and former officers, employees, directors, agents, attorneys, accountants, investment bankers, trustees and beneficiaries, from similar Claims, upon receipt of a reciprocal release from such entities. Additionally, the debtor will discontinue and dismiss 16 Shareholder Derivative actions brought by certain Texaco shareholders on behalf of Texaco arising out of the Pennzoil judgment against Texaco.

12. **Interests of Texaco Stockholders.** Under the Plan, Texaco Stockholders will retain their equity interests in Texaco. Nevertheless, Texaco Stockholders are deemed impaired for purposes of the Plan and, therefore, may vote to accept or reject the Plan.

On January 29, 1988, this court found that the debtors' Second Amended Disclosure Statement satisfied the requirements of 11 U.S.C. § 1125 in that it contained adequate information in order to enable a hypothetical reasonable investor typical of the holders of claims or interests of the relevant classes to make an informed judgment about the class. Certain shareholders who are plaintiffs in derivative actions against Texaco's officers, directors and

third parties, objected to the adequacy of the information contained in the disclosure statement and this court's finding that it satisfied 11 U.S.C. § 1125. In a "So ordered" opinion dated February 9, 1988, Chief Judge Charles L. Brieant of the United States District Court for the Southern District of New York affirmed this court's ruling and held that the "[a]ppellants' objections to both the form and the substance of the Second Amended Disclosure Statement are held to be without merit." *C.J. Kirk et al. v. Texaco Inc. et al.*, 82 B.R. 678 (S.D.N.Y.1988).

On February 8, 1988, thirteen shareholders of Texaco Inc., identified as the Delaware Group, C.J. Kirk, Dorothy Kirk, Carbide Tool Grinding Service, Inc., Profit Sharing Plan, Leslie Maurer, Thomas Hughes, Etta Steiner, Sarah Steiner, Elizabeth Steiner and Ellen Leslie, all of whom are the plaintiffs (the "derivative plaintiffs") in sixteen shareholder derivative actions brought in the right of and for the benefit of Texaco Inc. which are pending in Delaware, Texas and New York, had interposed objections to the confirmation of the Plan.

The derivative plaintiffs did not object to the monetary terms of the settlement with Pennzoil. They support the $3 billion settlement because they believe it is in the best interests of all Texaco shareholders. However, they objected to the provisions of the Plan calling for the abandonment and dismissal of the plaintiffs' derivative actions and the grant of releases and indemnifications to the defendants in such actions, including officers, directors and other representatives of Texaco, as well as the Getty Oil Company ("Getty"), the Sarah C. Getty Trust, the Getty Museum, First Boston Corporation and Goldman Sachs & Co., investment bankers for Texaco and Getty, respectively. The derivative plaintiffs maintained that the derivative actions constitute an asset of the debtors worth at least as much as Texaco must pay to Pennzoil if the settlement is approved. Accordingly, the derivative plaintiffs contended that the abandonment and dismissal of the derivative actions and the granting of releases and indemnifications to the defend-

ants in such actions and to third parties renders the Plan unconfirmable in that the Plan does not satisfy the requirements imposed under 11 U.S.C. §§ 1129(a)(1), (2) and (3).

The objectants pointed to 11 U.S.C. § 1129(a)(1) and argued that the Plan is not confirmable in that it allegedly violates 11 U.S.C. § 554 because it contemplates the abandonment of the derivative actions which are of value and not burdensome to the estate.

The objectants contended that 11 U.S.C. § 1129(a)(2) is not satisfied because applicable provisions of the Bankruptcy Code were not complied with because the Plan is the product of alleged gross breaches of fiduciary duty by Texaco's self-interested officers and directors who are among the parties directly benefitted by the grant of releases and that such action is incompatible with their duties under 11 U.S.C. § 1107 in the administration of the Chapter 11 cases.

Section 1129(a)(3), which requires that a plan shall be proposed in good faith and not by any means forbidden by law, was also cited by the objectants. As to good faith, the objectants alleged that the Plan was not proposed in good faith because it allegedly stripped the shareholders and Texaco of the value of significant causes of action in order to protect insider management and third party entities who are neither insiders nor debtors, namely the Getty Oil Company, the various Getty trusts and the Getty Museum as well as the First Boston Corporation and Goldman Sachs & Co. The objectants also contended that the Plan failed to comply with applicable state law because independent investigation and evaluation by a special committee or other similar independent person or entity and judicial approval are alleged as necessary if the dismissal of derivative actions and the granting of releases and indemnifications under the Plan are to be allowed under applicable federal and state law.

Additionally, an objection was filed by Trans World Airline, Inc., ACF Industries, Inc., Swan Management Corp., and Unicorn

898

Associates Corp. (collectively "The Icahn Group"). The Icahn Group purchased approximately 14.8% of Texaco's common stock after the commencement of the chapter 11 cases and represents the largest single ownership of Texaco's equity interest. The Icahn Group joined the derivative plaintiffs in objecting that the indemnifications, releases and discontinuances of derivative actions should not be approved because the derivative actions are intended to retrieve for Texaco valuable causes of action which should not be dismissed or confirmed. The Icahn Group suggests that the provisions in the plan dealing with indemnifications, releases and discontinuances of derivative actions should be severed from the balance of the Plan, which should be confirmed including the $3 billion settlement with Pennzoil.

The debtors state that the granting of releases and indemnifications to the debtors' officers and directors and to third parties, were matters that were initiated by Pennzoil and the General Committee of Unsecured Creditors and were originally included in the plan of reorganization that was unsuccessfully proposed by the General Committee of Unsecured creditors, dated November 27, 1987. As a co-proponent of the Plan, Pennzoil states that it does not want to become involved in any further litigation arising from the Getty Oil transaction and for that reason it seeks an overall resolution of all claims and litigation. Pennzoil maintains that the total acquisition cost to Texaco of the Getty Oil transactions, including the cost of Pennzoil settlement, represents a substantial long-term value and benefit to Texaco and its shareholders. Both Pennzoil and Texaco reason that it is in the best interests of all parties that the Getty Oil controversy, inclusive of all ancillary matters, be ended so that Pennzoil and Texaco may direct their efforts to their respective businesses without continuing costly and time-consuming litigation.

Texaco states that the Pennzoil complaint was without merit and should not have been sustained. However, Texaco believes that the catastrophic results for Texaco's shareholders that will result if the case is not settled and if the Supreme Court does not grant *certiorari* fully justify the settlement. Nonetheless, in order for Texaco or any of the derivative plaintiffs which sued on its behalf, to recover against any defendant on the claims asserted by the derivative plaintiffs, they would probably have had to assert and prove some or all of the elements of Pennzoil's case against Texaco. In such case, Texaco, or anyone suing on its behalf, might be confronted with Texaco's own repeated assertions that, as a matter of law, there was no binding contract among Pennzoil and the Getty Oil entities. Texaco believes there is little merit to any derivative action because the Getty Oil defendants and others covered by the releases and indemnifications might succeed in establishing as Texaco has consistently asserted, that there was no binding contract with Pennzoil. Thus, Texaco asserts that it has been advised by outside counsel that there would be substantial difficulties in achieving any recovery on Texaco's potential claims against the Board of Directors and other third parties. Texaco, therefore, reasons that the releases and indemnifications, with respect to actions of questionable value, should be given and the derivative actions discontinued in order to achieve a settlement of the Pennzoil litigation.

The General Committee of Unsecured Creditors and the Equity Committee of Texaco shareholders fully support the Plan, which includes the Pennzoil settlement and the granting of releases and indemnifications in addition to the discontinuance of all the derivative actions.

On March 22, 1988, in the morning just before the confirmation hearing was about to commence, the derivative plaintiffs entered into a settlement with Texaco whereby they withdrew their objections to the issuance of releases, indemnifications and discontinuances of the derivative actions.

The derivative plaintiffs withdrew their objections to the Plan with the understanding that their attorneys would be permitted to file applications for prepetition and post-petition legal services not to exceed a total of $10 million for all of the

twenty-one law firms representing the derivative plaintiffs. Half of the legal fees would be paid by Texaco's liability carriers and the other half would be paid by other third party defendants. Thus, Texaco would not be required to bear the direct cost of the derivative plaintiffs' legal fees.

The Icahn Group continues to object to the inclusion in the Plan of releases and indemnifications in favor of Texaco's own officers and directors as well as the issuances of releases and indemnifications to the Getty interests, lawyers, accountants and investment bankers.

Baine Kerr, Chairman of Pennzoil's Executive Committee, testified that the concept of releases and indemnifications was first introduced by Pennzoil without any consultation with Texaco. He said that Pennzoil would not agree to sever or modify the provisions in the Plan for releases and indemnifications because Pennzoil agreed to reduce its claim for $11.259 billion to $3 billion in order to obtain a complete and swift resolution of its claim. Mr. Kerr testified that Pennzoil would not go through with the Plan if the releases and indemnifications were eliminated. Similarly, J. Hugh Liedtke, the Chairman of the Board and Chief Executive Officer of Pennzoil, testified that the major reason for the releases and indemnifications in Pennzoil's view is the termination of all litigation, which should be financed by Texaco. He said that the releases and indemnifications were needed in order to get the creditors and equity committees to endorse the Plan.

Texaco's Chairman of the Board, Alfred C. DeCrane, testified that in 1986, after the Pennzoil judgment was obtained, Texaco retained two law firms, Gable & Gotwals of Oklahoma and Morris, Nichols, Arsht & Tunnell of Delaware, to investigate the handling of the Getty Transaction by officers and management of Texaco. These investigations revealed that there was no self-dealing or improper conduct by Texaco's management and no misstatement by the Getty interests as to any impediments to Texaco's acquisition of the Getty stock.

James Sturdivant, a partner in the law firm of Gable & Gotwals, and Richard Sutton, a partner in the law firm of Morris, Nichols, Arsht & Tunnell, each testified to the effect that Texaco's management did not do anything wrong in connection with the Getty Transaction and they concluded that Texaco's officers and directors could not be held responsible for any claims asserted in the derivative actions that were brought by the various Texaco shareholders on behalf of Texaco. Hence, this court finds that the releases and indemnifications to be issued by Texaco under the Plan are in the best interests of Texaco in obtaining an integrated settlement of the Pennzoil judgment and do not amount to the relinquishment or abandonment by Texaco of valuable causes of action.

## DISCUSSION

The largest bankruptcy case in the history of this country must meet the same standards for confirmation of its plan of reorganization as any other Chapter 11 case. The plan must comply with the applicable provisions of title 11 as expressed in 11 U.S.C. § 1129(a)(1) and it must have been proposed in good faith and not by any means forbidden by law, as mandated under 11 U.S.C. § 1129(a)(3). The objections filed by certain shareholders of the debtor, Texaco Inc., who are plaintiffs in derivative actions brought on behalf of Texaco against some of its officers, directors and third parties, bring into focus the requirement that the Second Amended Joint Plan of Reorganization (the "Plan") must satisfy the requirements of Chapter 11 and applicable provisions of federal and state law. This is so even if Texaco's shareholders, who are deemed under the Plan as the only impaired class for purposes of voting, have overwhelmingly voted to accept the plan, which they have done by a majority vote of approximately 96 percent. In this connection, it should be noted, however, that the basic feature of the Plan is the settlement of the Pennzoil judgment in excess of $11.259 billion for a payment of $3 billion dollars. Additionally, the officers, directors and representatives of Pennzoil are to be released and indemnified by Texaco for any and all claims arising out of this

settlement, and they in turn, will issue reciprocal releases to Texaco's officers, directors and representatives. The objectants agree with this settlement, but argued that in order to achieve this end, the Texaco shareholders were compelled to vote for an entire package, which also includes releases and indemnities which Texaco will issue to its own officers and directors and to third parties including attorneys, accountants, investment bankers, and entities who sold the Getty Oil stock to Texaco which precipitated the Pennzoil suit and judgment against Texaco.

Before the derivative plaintiffs withdrew their objections they contended that the issuance of releases and indemnities to non-Pennzoil representatives, such as Texaco's own officers and directors and the attorneys, accountants, investment bankers of Texaco and the Getty interests, as well as the Getty shareholders who sold the disputed Getty stock to Texaco, together with the discontinuance of the objectants' derivative lawsuits with prejudice, violates the provisions of title 11 and applicable federal and state law. Moreover, the objecting Icahn Group contends that the overwhelming vote of the shareholders in accepting the plan merely reflects that the Texaco shareholders could not afford to risk being wiped out by rejecting the Plan and, therefore, were coerced into acceptance because they could not vote separately for the Pennzoil settlement without also being compelled to vote for the issuance of releases and indemnities to non-Pennzoil representatives and the discontinuance of the derivative suits on Texaco's behalf. The objecting Icahn Group contends that Pennzoil and the creditors of Texaco have no legitimate interest in discouraging the derivative shareholder plaintiffs from attempting to recover against the Texaco officers, directors, third parties, and their insurance carriers, so long as Pennzoil is paid $3 billion and is given indemnities and releases under the Plan. The Icahn Group reasons that the derivative suits seek to recover assets for Texaco to compensate for what Texaco has to pay to Pennzoil under the Plan and that the recovery of any such assets for Texaco will not affect

Pennzoil after it collects the $3 billion settlement because the Pennzoil representatives will be indemnified and released by Texaco under the Plan with regard to any possible subrogation claims. Moreover, the Icahn Group concludes that Texaco's creditors will not be affected because assets may be retrieved for Texaco's benefit, whereas the creditors will be fully paid under the Plan, together with interest, or they will be reinstated as if no default had occurred.

The net effect of the indemnities and releases of non-Pennzoil interests and the discontinuances of the objectants' derivative actions is to erase the potential liabilities of these third parties to Texaco. If these non-parties were possibly liable to creditors other than Texaco, such releases, indemnities and discontinuances of derivative actions would not be effective against the other creditors because such a result would be contrary to the principle expressed in 11 U.S.C. § 524(e), which is made applicable to Chapter 11 cases by 11 U.S.C. § 103(a). Section 524(e) states in relevant part that a

> ... discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

Thus, payment to a creditor under a confirmed plan of reorganization "is not consideration for any promise by creditors, much less for one to release non-party obligations." *Union Carbide Corporation v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982). The confirmation of a Chapter 11 plan of reorganization should not release the obligations of non-party entities to creditors of a debtor. *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir.1987); *United States v. Stribling Flying Service, Inc.*, 734 F.2d 221, 223 (5th Cir.1984).

However, 11 U.S.C. § 524(e) does not apply to the Texaco Joint Plan because the proposed releases, indemnities and discontinuances of derivative actions relate to claims belonging to the debtor only, and do not affect the claims of any creditors. The Plan proposes to release any claims that the debtors may have against Texaco's offi-

cers and directors and against the non-Pennzoil third parties arising out of Texaco's acquisition of the Getty Oil stock. Accordingly, what is involved is the debtors' abandonment or relinquishment of questionable causes of action in the face of objections originally filed and now withdrawn, by specific shareholders who are the plaintiffs in the derivative actions which are sought to be discontinued. The limited objection filed by the Icahn Group was not withdrawn, and must therefore be resolved.

## THE PENNZOIL JUDGMENT

This is not a simple plan of reorganization. This plan was consummated by Texaco and Pennzoil after intense negotiations which led to a compromise and settlement between the above parties and the statutory committees, wherein Texaco agreed to terminate the Texas litigation and Pennzoil agreed to accept $3 billion in satisfaction of the Texas judgment. This compromise and settlement has been incorporated into the Plan and the parties are claiming the terms or the consideration of the settlement include the releases by the derivative plaintiffs and indemnifications of all the parties stated above thereby requiring the retention of such provisions in the Plan.

█ The judgment claim asserted by Pennzoil amounts to approximately $11.259 billion, inclusive of interest. Texaco and Pennzoil have arrived at a $3 billion figure which will be paid by Texaco to Pennzoil upon confirmation of the reorganization Plan. By jointly proposing the Plan with Texaco, Pennzoil has indicated its willingness to reduce its claim to $3 billion and its acceptance of the Plan as proposed, within the meaning of 11 U.S.C. § 1129(a)(8)(A). Texaco states that 11 U.S.C. § 1123(b)(3) empowers it to compromise and settle Pennzoil's claim. This is not so because 11 U.S.C. § 1123(b)(3) permits a plan to provide for "the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*" (Emphasis added). The Pennzoil claim does not belong to the debtor or to the estate. However, a compromise between parties in the context of a bankruptcy reorganization may be accomplished in a bankruptcy case with the court's approval. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) (1968); *Matter of AWECO, Inc.*, 725 F.2d 293, 297 (5th Cir.1984) *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984); *In re Heissinger Resources Ltd.*, 67 B.R. 378 (C.D.Ill.1986). Compromises may be effected separately during reorganization proceedings or in the body of the reorganization plan itself. The decision of whether to approve a particular compromise lies within the discretion of the Bankruptcy judge and pursuant to Bankruptcy Rule 9019(a). *Matter of AWECO*, 725 F.2d at 297.

With regard to approval of compromises that form part of a plan of reorganization, a definite rule limits the exercise of discretion. This rule provides a court may approve such a compromise only when it is "fair and equitable." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *Matter of AWECO, Inc.*, 725 F.2d at 298; *Matter of Investors Funding Corp. of New York*, 8 B.R. 739, 743 (S.D.N.Y.1980). The important determinations in reorganization proceedings must receive the "informed, independent judgment of the Bankruptcy court". *Protective Committee v. Anderson*, 390 U.S. at 424, 88 S.Ct. at 1163. The duty of a bankruptcy judge to reach an "intelligent, objective and educated evaluation" of settlements cannot be carried out absent factual background. *Matter of Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir.1980). In approving compromises the court must act independently and for the benefit of all parties in interest. This obligation prevails even where parties in interest are silent and even where a party in interest has engaged in conduct that might amount to a waiver of objections in another context. *See Matter of AWECO*, 725 F.2d at 299; *Matter of Boston & Providence R. Corp.*, 673 F.2d 11 (1st Cir.1982); *Ashbach v. Kirtly*, 289 F.2d 159, 166 (8th Cir.1961). The test to be

applied where there is judicial review of a consensual plan of reorganization is

> whether or not the terms of the proposed compromise 'fall within the reasonable range of litigation possibilities' [citations omitted]. The reviewing court must determine that the value of the proposed compromise distribution is reasonably equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved.

*Barry v. Smith (In re New York, New Haven and Hartford Railroad Co.)*, 632 F.2d 955, 960 (2d Cir.1980) *cert. denied*, 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980); *Matter of Investors Funding Corp. of New York*, 8 B.R. at 743.

■ The terms "equity" and "fairness" are not only terms of art in bankruptcy; they are catch words of bankruptcy law in general. Equitable considerations should be preeminent in the exercise of bankruptcy jurisdiction. *Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). Decisions as central to bankruptcy proceedings as approval of settlements cannot be visceral. They must issue from reason and rest upon factual undergirdings. *Matter of AWECO*, 725 F.2d at 300.

A court should consider the following factors in reaching its ultimate decision to approve a compromise and settlement:

(1) The balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis a vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures.

(2) The prospect of complex and protracted litigation if the settlement is not approved.

(3) The proportion of the class members who do not object or who affirmatively support the proposed settlement.

(4) The competency and experience of counsel who support the settlement.

(5) The relative benefits to be received by individuals or groups within the class.

(6) The nature and breadth of releases to be obtained by the directors and officers as a result of the settlement.

(7) The extent to which the settlement is truly the product of "arms-length" bargaining, and not of fraud or collusion.

*See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968); *In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir. 1983), *cert. denied, sub nom; Casoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

In the instant case, the highest court of the state of Texas has refused to grant Texaco's writ of error with respect to the Pennzoil judgment. Texaco's only available avenue for direct review is by a petition for a writ of *certiorari* to the United States Supreme Court. This possibility for review is discretionary and limited to federal statutory and constitutional issues. The odds against Texaco's obtaining a writ of *certiorari* are enormous. Even if granted, it does not follow that Texaco's appeal would succeed. Moreover, if the Supreme Court were to remand the case for a new trial, there is no assurance that Pennzoil would not again prevail on the merits of its claim.

In the Second Amended Disclosure Statement, Texaco states that it "believes that the catastrophic results for Texaco's Stockholders that will result if the case is not settled and if the Supreme Court does not grant *certiorari* ... fully justify the Pennzoil Settlement." A settlement will avoid the risk of having to satisfy the full amount of Pennzoil's judgment, which now exceeds $11.259 billion, inclusive of interest. If Texaco were required to satisfy this judgment in full, its shareholders will likely have their interests completely eliminated. Unless Texaco were able to convince the Supreme Court that significant federal issues were involved, apart from state law issues, a Supreme Court review of the judgment would be unlikely, thereby jeopardizing the shareholders' interests.

The settlement of the Pennzoil judgment reduces Texaco's maximum exposure to Pennzoil to $3 billion and reduces Penn-

zoil's judgment claim by more than $8 billion. The settlement benefits Pennzoil to the extent that Pennzoil need not wait indefinitely for a contested payment, because it will receive $3 billion in cash no later than April 14, 1988. Texaco's creditors are benefitted because they will be paid in full. Significantly, the settlement is in the best interests of Texaco's shareholders because they will retain their interests despite the fact that Pennzoil, a member of the senior class of unsecured creditors, will receive less than the full amount of its claim. In sum, the settlement of the Pennzoil judgment for the reduced sum of $3 billion is fair and equitable in that it respects the policy of reorganization and is consistent with the principle regarding the priority of payments mandated under the Bankruptcy Code. Indeed, there are no objections addressed to the amount of the payment to Pennzoil; the statutory committees of creditors and shareholders fully support the settlement as do approximately 96 percent of the voting shareholders who have agreed to accept the Plan.

## INDEMNIFICATIONS, RELEASES AND DISCONTINUANCES OF DERIVATIVE ACTIONS

The provisions in the Plan which propose to dismiss with prejudice the derivative actions commenced by certain shareholders on behalf of Texaco with respect to the Getty Oil Transaction and to grant releases and indemnifications to the defendants in such actions was viewed by the objectants as the relinquishment of valuable property rights. This position is tenable only if Texaco has a meritorious claim against the defendants in the derivative actions. However, the derivative claims are premised on the Pennzoil judgment, which reflects the Texas jury's conclusion that Texaco had knowledge of the contract existing between Getty Oil Company and Pennzoil and that Texaco nevertheless willfully induced a breach of that contract. Hence, Texaco was found liable to Pennzoil for compensatory and punitive damages. Accordingly, the derivative plaintiffs who stood in Texaco's shoes for the purpose of pursuing their derivative complaints, were bound by the preclusive effect of the Pennzoil judgment. Texaco and the derivative plaintiffs are therefore collaterally estopped from claiming that Texaco did not intentionally interfere with a contract between the Getty Oil interests and Pennzoil. *Parklane Hosiery v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). On the other hand, the Getty defendants and the other third party defendants who were not parties to the litigation between Texaco and Pennzoil, and who did not participate in that litigation, are not bound by the collateral estoppel doctrine and may litigate the issues as to which Texaco is barred from relitigating. *Parklane Hosiery v. Shore*, 439 U.S. at 326, 99 S.Ct. at 649; *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

The Getty defendants and the other third party defendants would be free to relitigate the issue that the Getty Oil interests had not entered into a contract with Pennzoil and that there could not be a consideration of such an agreement by the Board of Directors of Getty Oil Company until a definitive written document had been presented to the Board for approval.

> Thus, the magnitude and complexity of the deal not only reinforce the parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all the parties' commitments in definitive documents.

*Reprosystem, B.V. v. SCM Corporation*, 727 F.2d 257, 262–63 (2d Cir.1984), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). Additionally, two of the four parties to the Getty Transaction were fiduciaries; the Sarah C. Getty Trust and the Getty Museum. Both fiduciaries had serious authority problems. Mr. Gordon Getty, as trustee of the Sarah C. Getty Trust, and Harold Williams, as trustee of the Getty Museum, together controlled a majority of the Getty shares. Both fiduciaries are not estopped from arguing that under Delaware law, which governs the rights of shareholders of the Getty Oil Company, the requisite shareholder approv-

al of the transaction with Pennzoil had not been obtained. Thus, the derivative actions commenced by certain Texaco shareholders would have no value as against the Getty defendants and other third party defendants if these defendants succeed in establishing, as they vigorously claim, that no valid contract existed between Pennzoil and the Getty interests and that they were free to negotiate the sale of the Getty shares to Texaco. Obviously, Pennzoil does not wish to be drawn into this litigation and therefore insists that in exchange for Pennzoil's consent to a reduced claim of $3 billion dollars all further litigation regarding the Getty Transaction be concluded and dismissed under the Plan. In these circumstances, not only are the derivative actions against the Getty interests and other third party defendants of questionable value, but they amount to a negative factor which Pennzoil insisted on eliminating in consideration for Pennzoil's consent to the reduction of its judgment claim of approximately $11.259 billion to an allowable claim of $3 billion.

The granting of releases and indemnifications to Texaco's own officers and directors and the discontinuances of the derivative actions against the Texaco defendants also does not amount to the relinquishment of a valuable property right of the Texaco estate. The fact that Texaco has been found to have tortiously interfered with an existing agreement between Pennzoil and the Getty interests, does not mean that Texaco's officers and directors are estopped from denying that they breached their fiduciary duties to Texaco or were guilty of mismanagement. These issues were not litigated in the Texas action brought by Pennzoil against Texaco. Indeed, Chief Judge Charles L. Brieant, in affirming this court's approval of Texaco's disclosure statement, questioned the application of the doctrine of offensive collateral estoppel for the purpose of precluding Texaco's officers and directors from defending against the charges of fiduciary breach of duty and mismanagement saying:

> As noted earlier, this Court believes there is no basis for applying collateral estoppel offensively against the defend-

ants in the derivative cases. While Texaco may itself be estopped by the Texas judgment after it becomes final, the corporate directors and other fiduciaries were not parties to that action and could not conceivably have become parties, so they probably are not bound by principles of collateral estoppel.

*C.J. Kirk et al. v. Texaco Inc. et al.,* 82 B.R. 678, 685 (S.D.N.Y.1988).

Not only would the Texaco officers and directors be free to demonstrate that they acted properly and were not in breach of their fiduciary responsibilities or guilty of mismanagement, but they would undoubtedly be permitted to assert that Pennzoil's conduct in the Getty Transaction violated SEC Rule 10b-13. Manifestly, Pennzoil does not want to spend time and effort defending this issue after having agreed to Texaco's reorganization Plan. Therefore, in consideration for its acceptance of the Plan, Pennzoil demands that all further litigation concerning the Getty Transaction be terminated. The court may not selectively reform the comprehensive Plan because it represents a consensus arrived at by Pennzoil and Texaco, with the full support of the statutory committees and has been accepted by approximately 96 percent of Texaco's voting shareholders. Modifications of this Plan cannot be imposed upon Texaco, Pennzoil, Texaco's creditors and Texaco's shareholders without their consent. *Barry v. Smith (In re New York, New Haven & Hartford R.R.),* 632 F.2d 955, 959 (2d Cir.1980), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980); *In re International Oil Co.,* 4 B.C. D. 80, 81 (Bankr.S.D.N.Y.1980).

The value of the derivative actions against Texaco's own officers and directors is further diminished by the fact that under Texaco's By-laws, its officers and directors are indemnified for liabilities incurred while acting on behalf of Texaco. Hence, the claims asserted by the derivative plaintiffs would be offset pursuant to the By-law indemnifications. The issuance of releases and indemnifications under the Plan to Texaco's officers and directors would

represent no additional relinquishment of causes of action by Texaco.

## THE PLAN MUST SATISFY 11 U.S.C. § 1129

In order for the Plan to be confirmed, it must satisfy each of the requirements imposed under Section 1129 of the Bankruptcy Code.

1. *Section 1129(a)(1) (Plan compliance with Title 11).*

Section 1129(a)(1) requires that a plan comply with "the applicable provisions of this title." These provisions include sections 1122 and 1123 of the Bankruptcy Code, governing the classification of claims and interests and the contents of a plan of reorganization. In determining whether a plan complies with section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to the classification of claims and the contents of a plan of reorganization. *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr.S.D.N.Y. 1984).

a. Section 1122.

Section 1122(a) provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class. Article II of the Plan, designating the classes of claims and interests under the Plan, places only claims and interests that are "substantially similar" to each other in Class 1 through Class 8. The Plan therefore complies with section 1122.

b. Section 1123.

Section 1123 of the Bankruptcy Code sets forth the mandatory and permissive contents of a plan. The Plan contains each of the mandatory provisions listed in section 1123(a).

i. *Compliance with Section 1123(a).*

Section 1123(a)(1) requires that a plan designate classes of interests and classes of claims, other than claims of a kind specified in section 507(a)(1) (administrative expense claims), section 507(a)(2) (claims aris-ing during the "gap" period in an involuntary case), and section 507(a)(7) (tax claims). The Plan classifies all claims and interests in Class 1 through Class 8 designated in Article II. The Plan therefore complies with section 1123(a)(1).

Section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan." Article IV of the Plan states that all Classes of claims are not impaired. The holders of equity interest are stated to be impaired for voting purposes only.

Section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." Article V of the Plan provides that although Class 8–A is deemed impaired under the Plan, the holders of interests in Class 8–A shall retain unaltered their shares of Texaco common stock and accompanying rights to purchase additional stock pursuant to the December 10, 1985 Rights Agreement. The Plan therefore complies with section 1123(a)(3).

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Plan provides for the same treatment for each claim or interest of a particular class. Pennzoil has agreed, subject to the terms and conditions of the Plan and the Pennzoil Settlement Agreement, to accept less favorable treatment of the Pennzoil Judgment Claim than the treatment the Plan provides for other claims in Class 6. The Plan therefore complies with section 1123(a)(4).

Section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth several examples of such adequate means. Articles IV and VII of the Plan describe the means for executing the Plan. The means set forth in Articles IV and VII are adequate to enable the Debtors to implement the Plan, including the payment of $3 billion cash to Pennzoil that is required to settle the Pennzoil

Judgment Claim, and the Plan thus complies with section 1123(a)(5).

Section 1123(a)(6) requires that a plan "provide for the inclusion in the charter of the debtor ... of a provision prohibiting the issuance of nonvoting equity securities, and providing as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes ...". Article VII.E of the Plan provides the Debtors' corporate charters shall be amended as of the Effective Date to the extent necessary to prohibit the issuance of nonvoting equity securities and that Texaco's corporate charter shall be amended to provide that the holders of shares of Series A Preferred Stock shall be entitled to 100 votes per whole share in the election of directors and shall vote as one class with the holders of Common Stock. This is an appropriate distribution of voting power among the classes of Texaco stock. The Plan therefore complies with section 1123(a)(6).

Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." There are no provisions in the Plan regarding the selection of the Debtors' officers and directors which are inconsistent with the interests of creditors and equity security holders or with public policy.

### ii. Compliance with Section 1123(b).

Section 1123(b) of the Bankruptcy Code describes certain permissive plan provisions. The Plan contains a number of these provisions.

Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." The Plan deems the class of Texaco Stockholders impaired solely to permit that class to vote on the Plan and leaves all other classes of claims and interests unimpaired.

Section 1123(b)(2) permits a plan to "provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected ...". Article VI of the Plan contains provisions consistent with section 1123(b)(2) regarding the assumption and rejection of various executory contracts and unexpired leases.

Section 1123(b)(3) permits a plan to provide for the debtor's retention, enforcement, settlement, or adjustment of any claim or interest belonging to the debtor or the estate. Article VII.C.1 of the Plan provides that each Debtor shall be revested with all of the property of its respective estate, including claims, interests, or causes of action. Article VII.K provides that each Debtor may settle, adjust, or enforce any such claim, interest, or cause of action, subject to Article VII.D, providing for the extinguishment of all avoiding power causes of action.

Section 1123(b)(4) permits a plan to "provide for the sale of all or substantially all of the property of the estate ...". Although the Plan does not provide for the sale of all or substantially all of the Debtors' assets, Articles VII.A.1 and VII.C.2 do provide that the Debtors may take any actions necessary or appropriate to obtain funds to make the payments required under the Plan, including the sale of some of their assets.

Section 1123(b)(5) also authorizes the inclusion in a plan of "any other appropriate provision not inconsistent with the applicable provisions of this title." The Plan does not contain any provision that is inconsistent with the applicable provisions of title 11.

Accordingly, the Plan complies both with section 1122 and with the mandatory and permissive provisions of section 1123. Thus, the Plan satisfies the requirements of section 1129(a)(1).

### 2. Section 1129(a)(2) (Proponent Compliance with Title 11).

Section 1129(a)(2) requires that the plan proponent comply with the applicable provisions of title 11. The principal purpose of

Section 1129(a)(2) is to assure that the proponents have complied with the requirements of section 1125 in the solicitation of acceptances to the plan. *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984) (section 1129(a)(2) requires that "the proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with Code §§ 1125 and 1126."). Section 1125(b) provides that proponents may not solicit acceptances of their plan unless, at the time of or before such solicitation, there is transmitted to the solicitee a copy of the plan and a court-approved disclosure statement.

The United States District Court has affirmed the Disclosure Statement Order, including this Court's finding that the Disclosure Statement contains adequate information within the meaning of section 1125.

### 3. *Section 1129(a)(3) (Good Faith).*

Section 1129(a)(3) requires that a plan have been "proposed in good faith and not by any means forbidden by law". Although the term "good faith" is left undefined by the Code, "[i]n the context of a Chapter 11 reorganization ... a plan is considered proposed in good faith 'if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.' " *Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1315 (8th Cir.1987) (quoting *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984)). "[T]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals." *Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383 (5th Cir.1984). "According to the good faith requirement of section 1129(a)(3), the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code." *In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984) (distinguishing between "the good faith that is required to *confirm a plan* under section 1129(a)(3) and the good faith that has been established as a *prereq-*

*uisite to filing* a Chapter 11 petition for reorganization.") (emphasis in original); *accord In re Johns–Manville Corp.*, 68 B.R. 618, 631 (Bankr.S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987).

The Plan embodies the means for resolving all of the litigation resulting from Texaco's acquisition of Getty Oil and the Pennzoil Judgment (other than the Class Action), and permits the Debtors to turn their full attention to the operation of their businesses. The Plan also enables the Debtors to bring current, and resume future payments on, all of their obligations. Further, the Plan allows Texaco to resume the payment of dividends to shareholders to any extent that Texaco's Board of Directors believes appropriate.

The Plan permits the Debtors to emerge from Chapter 11 promptly, leaves all classes of claims unimpaired, drastically reduces Texaco's liability to its largest creditor, and preserves substantial equity for the Texaco Stockholders. The history of these Chapter 11 cases, culminating in the Debtors' and Pennzoil's joint proposal of the Plan, provides ample basis to satisfy this Court that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.' " *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir.1984). Thus, the Plan satisfies the requirements of section 1123(a)(3).

### 4. *Section 1129(a)(4) (Disclosure of Payments).*

Section 1129(a)(4) requires that:

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

Pursuant to this Court's order of July 17, 1987, applications for allowances of interim compensation and for reimbursement of expenses have been filed on a periodic basis

by various professionals retained pursuant to this Court's orders since the filing of the Chapter 11 cases, and such applications have either been acted upon by this court or remain pending. In addition, the Debtors, pursuant to orders of this court entered on May 1, 1987 and July 17, 1987, have been authorized to engage "ordinary course of business" attorneys and professionals and to pay compensation to these attorneys and professionals without the need to file applications for compensation so long as the compensation paid does not exceed the aggregate "cap" fixed by this court in the retention orders. The applications and retention orders referred to above are on file with the Clerk of this court and may be reviewed by any party in interest.

All fees and expenses that the Debtors have paid during their Chapter 11 cases are subject to the final approval of this court as reasonable because all attorneys and professionals who have rendered services to or at the expense of the Debtors or their estates during their cases must file applications for final approval of their fees and expenses under section 330 of the Bankruptcy Code. These procedures for review and ultimate determination by this court of the professional fees and expenses to be paid by the Debtors satisfy the objectives of section 1129(a)(4).

5. *Section 1129(a)(5) (Disclosure of Officers, Directors, and Insiders).*

Section 1129(a)(5)(A) requires the plan proponent to disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as an officer or director of a debtor. Section 1129(a)(5)(A) also requires the court to find that the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy.

Section 1129(a)(5)(B) requires the plan proponent to disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider. Section 101(30)(B) defines insider, in the case of a corporation, to include directors, officers, persons in control of the debtor, partnerships in which the debtor is a general partner, general partners of the debtor, or relatives of any of the foregoing.

The Debtors' existing officers and directors who will continue to serve in such offices after confirmation of the Plan are listed in Section IX of the Disclosure Statement, pp. 39–43. Section IX also contains biographical data regarding the members of Texaco's Board of Directors. No reason has been shown why the continuation of these individuals in their respective offices is inconsistent with the interests of creditors and equity security holders or with public policy. *Cf. In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149–51 (Bankr.S.D.N.Y.1984) (finding continuity of experienced management satisfied section 1129(a)(5) and enhanced feasibility of plan). The Plan therefore satisfies the requirements of section 1129(a)(5).

6. *Section 1129(a)(6) (Rate Change Approved by Regulatory Commissions).*

Section 1129(a)(6) requires that the appropriate regulatory commission approve any changes in rates provided in the plan. The Plan does not provide for any rate change and, accordingly, section 1129(a)(6) does not apply.

7. *Section 1129(a)(7) (Best Interests Test).*

The "best interests" test set forth in section 1129(a)(7) requires the plan proponent to demonstrate that, with respect to each impaired class of claims or interests, the holder of each claim or interest in such class has either accepted the plan or will retain or receive under the plan property of a value as of the effective date of the plan that is not less than the amount that such holder would receive or retain if the debtor were to be liquidated under Chapter 7 of the Code. Because the Plan leaves all classes of claims and all classes of interests other than that of the Texaco Stockholders unimpaired, the best interests test is inapplicable with respect to those classes.

The Plan deems the class of Texaco Stockholders (Class 8–A) to be impaired, but solely for the purpose of permitting the Texaco Stockholders to vote on the Plan. Irrespective of the characterization in the Plan, the treatment accorded to the Texaco Stockholders does not impair Class 8–A within the meaning of section 1124 of the Bankruptcy Code. Because Class 8–A is not impaired within the meaning of section 1124, it follows that the best interests test is also inapplicable with respect to this class. Even if Class 8–A were regarded as impaired, the evidence in these cases establishes that the Texaco Stockholders would receive less if Texaco were liquidated under Chapter 7 than they are to receive under the Plan, and, therefore, the Plan satisfies the best interests test with respect to Class 8–A.

### 8. *Section 1129(a)(8) (Acceptance or Unimpairment).*

Section 1129(a)(8) requires that each class of claims and interests either has accepted the Plan or is not impaired under the Plan. All classes of claims and interests other than the class of Texaco Stockholders are not impaired under the Plan. The Plan deems Class 8–A of the Plan impaired solely in order to give the Texaco Stockholders an opportunity to vote on the Plan.

Section 1126(d) provides that a class of interests has accepted a plan "if such plan has been accepted by holders of such interests ... that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests ... that have accepted or rejected such plan", excluding the interests held by entities designated under section 1126(e) as not having voted in good faith.

Texaco has established that the Plan has been accepted by the holders of at least two-thirds in amount of the shares held by all Texaco Stockholders that have voted to accept or reject the Plan. Indeed, the Plan has been accepted by 96 percent of Texaco's voting shareholders.

### 9. *Section 1129(a)(9) (Administrative and Priority Claims).*

Section 1129(a)(9) requires that unless the holder of a particular claim agrees to a different treatment of such claim:

(i) holders of claims entitled to priority under section 507(a)(1) or (2) must receive cash in the allowed amounts of such claims on the effective date of the plan;

(ii) holders of claims entitled to priority under section 507(a)(3), (4), (5), or (6) must receive cash in the allowed amounts of such claims on the effective date of the plan or deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims; and

(iii) holders of tax claims entitled to priority under section 507(a)(7) must receive on account of such claims deferred cash payments, over a period not exceeding six years, of a value, as of the effective date of the plan, equal to the allowed amounts of such claims.

There are no claims against the Debtors entitled to priority either under section 507(a)(2) (ordinary course of business "gap" claims in an involuntary case) or under section 507(a)(5) (claims against debtors who own or operate a grain storage facility or a fish produce storage or processing facility).

Under Articles III.A and VII.A.2 of the Plan, claims entitled to priority under section 507(a)(1) are to be paid in cash and in full on the Effective Date or as soon thereafter as is practicable, in accordance with the ordinary business terms of payment of such claims, or at such time and in such amount as the holders of such claims shall agree.

The Plan classifies claims entitled to priority under section 507(a)(3), (4), and (6) in Class 4. The Plan provides that the holders of claims in Class 4 will receive cash on the Effective Date in an amount equal to the allowed amount of such claim, plus Post–Filing Date Interest, unless a holder

of such a claim agrees to different treatment of its claim.

With respect to tax claims entitled to priority under section 507(a)(7), Article III.B provides that each holder of an Allowed Claim of this type will receive cash on the Effective Date in an amount equal to the allowed amount of its claim, together with Post–Filing Date Interest, or shall be paid on such other terms as may have been or may be agreed to by such holder.

Thus, the Plan treats priority claims in accordance with the requirements of section 1129(a)(9).

10. *Section 1129(a)(10) (Acceptance by One Impaired Class of Claims).*

Section 1129(a)(10) provides that if a class of claims is impaired under a plan, at least one class of impaired claims must have accepted the plan before the court can confirm it. Because the Plan leaves all classes of claims unimpaired, section 1129(a)(10) does not apply.

11. *Section 1129(a)(11) (Feasibility).*

Section 1129(a)(11) requires the court to find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor ...". All that is required is that there be reasonable assurance of commercial viability. *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr.S.D.N.Y. 1986); *accord In re Johns–Manville Corp.,* 68 B.R. 618 (Bankr.S.D.N.Y.1986).

In determining whether a plan is "feasible" within the meaning of section 1129(a)(11), courts have identified the following factors as pertinent:

the prospective earnings of the business or its earning power; the soundness and adequacy of the capital structure and working capital for the business which the debtor will engage in post-confirmation; the prospective availability of credit; whether the debtor will have the ability to meet its requirements for capital expenditures; economic and market conditions; the ability of management, and the likelihood that the same management will continue; and any other related factors which would materially reflect on the company's ability to operate successfully and implement its plan.

*In re Prudential Energy Co.,* 58 B.R. at 862–63; *see also In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 151 (Bankr.S.D.N.Y.1984); *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr.D.N.J.1980). The Debtors have established at the confirmation hearing that, upon the emergence of the Debtors from Chapter 11, there is at least a reasonable prospect that the Debtors' earning capacity, together with their ability to obtain financing and sell assets, will be sufficient to fund the Plan. Such evidence adequately supports a finding by this Court that the Plan is feasible within the meaning of section 1129(a)(11).

12. *Section 1129(a)(12) (Section 1930 Fees).*

Section 1129(a)(12) requires that a plan provide that all fees payable under section 1930 will be paid on the effective date of the plan. Articles III.A.1 and VII.A.2 of the Plan provide that any fees or charges assessed against the estate of a Debtor under 28 U.S.C. § 1930, will be paid in cash and in full on the Effective Date. The Plan therefore complies with section 1129(a)(12).

13. *Compliance with Section 1129(a).*

In sum, the Plan satisfies each of the requirements contained in section 1129(a) with the result that the debtors are entitled to an order from this court confirming the Plan.

CONCLUSIONS OF LAW

■ 1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S. C. § 157(b)(2)(L).

2. The plan complies with the applicable provisions of title 11 (section 1129(a)(1)).

3. The plan proponent has complied with the applicable provisions of title 11 (section 1129(a)(2)).

4. The plan has been proposed in good faith and not by any means forbidden by law (section 1129(a)(3)).

5. The plan proponent has disclosed to the court any payment made or promised for services or for costs and expenses incurred in connection with the case or the plan and such payments have been approved by, or are subject to the approval of, the court as reasonable (section 1129(a)(4)).

6. The plan proponent has disclosed the identity, affiliations, and compensation of individuals proposed to serve as officers and directors of the debtor after confirmation and the continuance in such offices by such individuals is consistent with the interests of creditors and equity security holders and public policy (section 1129(a)(5)).

7. To the extent that the debtor is subject to the jurisdiction of any regulatory commission, any rate change provided in the plan has been approved by, or is subject to the approval of, such regulatory commission (section 1129(a)(6)).

8. Each holder of a claim or interest in an impaired class has either accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 (section 1129(a)(7)).

9. Each class of claims or interests has either accepted the plan or is not impaired under the plan (section 1129(a)(8)).

10. The treatment of administrative expense and priority claims under the plan complies with the provisions of section 1129(a)(9).

11. No class of claims is impaired under the plan.

12. Confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor (section 1129(a)(11)).

13. The plan provides for payment on the effective date of all fees payable under section 1930 (section 1129(a)(12)).

14. The debtors have satisfied all of the requirements for confirmation imposed under 11 U.S.C. § 1129(a), and are entitled to an order from this court confirming the Second Amended Joint Plan of Reorganization.